BRIAN BARROWS, Plaintiff-Appellee, *v.* MACO, INC., *et al.*, Defendants-Appellants.

First District (1st Division)    No. 80-1421

Opinion filed April 6, 1981.

Sneider & Troy, of Chicago (James R. Sneider and Randy G. Black, of counsel), for appellants.

J. William Stefan, of La Grange, for appellee.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:

Plaintiff Brian Barrows sued defendants Maco, Inc., and Maco Coatings, Inc. (collectively, Maco), for sales commissions alleged to be due under a written contract. Defendants counterclaimed for a setoff for commissions alleged to have been prepaid. After a bench trial, judgment for $12,750.64 was entered for plaintiff on the complaint and against defendants on their counterclaim. Defendants' post-trial motion was denied and they appeal.

Maco, Inc., and Maco Coatings, Inc., are the same corporation except for a name change. Maco was incorporated in 1972 and is in the cold roofing business. Richard Yohe and Dennis Yohe are the sole shareholders. Richard Yohe is the president and sole director. Dennis Yohe is a vice president.

Engineered Roofing Service, Inc. (ERS), was formed in 1975 to do hot roofing work as a subcontractor for Maco. Richard and Dennis Yohe each held 40 percent of the stock, with Allen Dresden holding the other 20 percent. Max Ortiz was its president. Maco and ERS had the same accounting department. ERS ceased doing business on or about December 15, 1977. While in existence, Maco subcontracted more than $1 million of work to it.

Richard and Dennis Yohe were partners in a partnership known as R & D Leasing, which owned and leased certain office and warehouse space to ERS in 1976 and 1977. Each participated in loans to ERS in 1975 totaling $31,051.

Richard and Dennis Yohe were also the sole shareholders and directors of Gravel-Vac, whose business was to remove gravel from roofing systems.

On January 27, 1976, plaintiff entered into a sales agreement with Maco. He had had no prior experience in the roofing business. He received two to three weeks of in-class chemical engineering analysis training and field training with senior salesmen. His responsibilities under the contract were to work a territory securing contracts and do general public relations work with the customers.

With reference to salesman's commissions, section six of the agreement provided:

"A. *Basic Commission on Jobs*: Salesman is to receive a commission of 26% of the net profit, as determined in accordance with the job cost sheet attached hereto and marked Exhibit 'B.' To qualify for payment of the commission, the Salesman must sell and supervise the job; the job must be completed and paid for; and the Salesman must have been in the continuous employment of the Company during the aforementioned period.

In such case that Salesman's employment shall be terminated for any reason prior to the complete supervision and installation of a job, the Salesman shall not be entitled to and shall not receive credit for any commission on the said job.

\* \* \*

C. *Sub-Contract Work*: Salesman is to receive a commission of 50% of the net profit of the sub-contract work performed by non-company crews or employees.

D. *Consulting Work*: \* \* \* All commissions payable under A and D above are payable and due only upon payment to Company from customer.

\* \* \*

F. All commissions due to Salesman on accepted jobs are due and payable only after the job is paid in full by the customer. All

funds advanced to Salesman by Company, on any job or contract, not paid at the end of the fiscal year of the Company shall be charged back by the Company to the account of the Salesman.* * *

G. It is understood that although commissions are not due and payable to Salesman on jobs sold until the terms set forth in Paragraph A have been complied with, the commission shall be credited to Salesman's commission account at the time the customer is invoiced for the job. Company shall provide Salesman, monthly, a statement of his commission account, showing paid and unpaid job accounts and commissions thereon, plus other charges and credits and draws, recorded against Salesman's commission account.

H. Company will furnish Salesman with a current list of prices and base costs on all products, merchandise, and services, based upon current 'suggested retail' prices as determined by present general competition."

In July 1977, plaintiff, on behalf of Maco, executed a contract in the amount of $129,603.58 with the Board of Education, Cook County School District #65, for certain roof repairs and masonry restoration to the Haven School in Evanston, Illinois. The amount was subsequently reduced to $108,831.23 by a change order. Maco had done business with School District #65 for many years prior to this contract.

The contract called for 60 percent of the roof to be torn off and replaced. The remaining 40 percent of the roof was to be resaturated. The tear-off and replacement job was "hot roof work" and could not be done by Maco. Prior to this contract, plaintiff had procured other contracts needing hot roof subcontractors and in each instance he had to use ERS. He was not given any choice as to who was going to do hot roof work. The names of ERS and Gravel-Vac were printed in the standard contract form used by Maco salesmen.

Plaintiff prepared the Maco "Contract Form." Under it, ERS was to do all of the work described in the plans and specifications, except for the plumbing, tuckpointing and flashing work. Maco was to perform the flashing work for $1,064, the figure determined by plaintiff and Dennis Yohe. Dennis Yohe told plaintiff to use D & D Plumbing for the plumbing work and Anderson Tuckpointing for the tuckpointing work.

Ortiz, president of ERS, supplied the price of $65,619.08 to plaintiff, which was inserted in the contract form. Plaintiff had gone over the plans and specifications of the tear-off and replacement job with Ortiz, who assured him that he could handle everything except the plumbing and tuckpointing work.

Dennis Yohe had to approve the contract forms completed by the

salesmen. Prior to submitting his bid, plaintiff discussed the prices furnished him from ERS, D & D Plumbing and Anderson Tuckpointing with Richard and Dennis Yohe and Bob Cefala, comptroller of Maco. On August 4, 1977, Richard Yohe, on behalf of Maco, executed a performance bond in the amount of $108,831.23.

Plaintiff was instructed by Cefala to insert the term "guaranteed commission $26,146.15" in the contract form. This figure was arrived at by deducting the prices of ERS, D & D Plumbing and Maco from the contract amount of $108,831.23. This $26,146.15 was the net profit that Maco would have made on the tear-off and replacement work had each subcontractor properly performed its work and been paid the prices listed on the contract form. According to the terms of his employment agreement, plaintiff would receive one-half of the $26,146.15 as his commission.

Plaintiff testified that he was present at the job site 60 to 90 times during the period from August 1977 through January 1978. It was his job to explain exactly what was happening on the roof to the school district personnel.

In July 1977 plaintiff had a conversation with Ray Green of the architectural firm concerning work to be done on the remaining 40 percent of the roof. This work was in addition to what was contemplated in the original bid documents. On August 16, 1977, plaintiff wrote a letter to Green, outlining a proposal by Maco for a roof maintenance program involving resaturation work. The school district approved the additional work for $19,120 in early October 1977. A customary "Job Folder" was filled out for the resaturation work by a secretary at Maco, with "Date of Order" being October 10, 1977. Next to the entry of salesman appeared the initials "B.B." crossed out and "D.Y." inserted. A purchase order to perform the additional work under the maintenance proposal did not issue until April 25, 1978, because, according to Dennis Yohe, the school district was dissatisfied with the performance by Maco. Gravel-Vac did the vacuuming of the gravel. The work was completed July 11, 1978.

The contract amount for the resaturation work, shown on the job folder as $19,120, was paid in full. The costs and expenses of the job were $8,734.23, leaving a net profit to Maco of $10,385.77. Pursuant to the sales contract between the salesman and Maco, the salesman involved would make 26 percent of the profit that Maco made.

Maco invoiced the school district for the tear-off and replacement work by sending out two invoices, each for $54,415.61. A third-quarter summary for plaintiff was prepared by the bookkeeping department of Maco. The entry for the Haven School job invoice dated September 2, 1977, reflects a "guaranteed commission" of $6,700 due him. This was paid on October 26, 1977. The entry for the second invoice dated

September 22, 1977, also reflects a "guaranteed commission" of $6,700. Plaintiff was involved in other contracts with "guaranteed commissions."

ERS encountered problems on the job site from August to December 1977. Six different foremen were in charge of the job at one time or another, including the female office secretary. Laborers of ERS were stealing the material and tools. The attitude of the workers was bad. Crews walked off the job.

None of the problems which arose at the Haven School was due to the neglect or oversight of plaintiff, who regularly met with John Cullnan, superintendent supervisor of custodial personnel of the school district, at the job site on the average of three to four times a week. Plaintiff told Dennis Yohe that the work at the school was not being done according to the specifications, but Dennis Yohe told him, "Don't worry. They will never see it."

In November 1977, Maco advised plaintiff that a number of his accounts were not paying their bills. A memorandum was sent to him advising him that no commission would be prepaid on accounts which were delinquent. The Haven School job was included among these accounts.

It became apparent to Richard Yohe in November and December 1977 that ERS was going out of business and "going down the tubes." The comptroller of Maco advised Richard Yohe to get as much money into ERS as possible by having Maco pay all its outstanding contract amounts to provide ERS with working capital. One of the main reasons ERS had problems which eventually led to its demise was that its owners did not pay enough attention and were not involved enough in its affairs.

It was the general custom of Maco not to pay any subcontractors before the work was completed. Maco made the decision to pay ERS its full invoice amount pursuant to two invoices at a time when it knew ERS had not completed all the work it was required to do at Haven School and that in so paying off ERS in full before its work was completed Maco would have to have somebody else complete the work which ERS was required to do.

On December 9, 1977, plaintiff received a phone call from the comptroller of Maco telling him that Maco was going to make the final payment to ERS. Plaintiff called Dennis Yohe concerning this final payment. Dennis told him, "That it's none of his business" and he (plaintiff) was not being very loyal to the company and he was going to have to be terminated.

On December 9, 1977, plaintiff's employment with Maco was terminated. Dennis Yohe testified that this termination was because plaintiff was not actively pursuing the well-established territory which he had been assigned, was not "cold calling" or developing new contracts, was

selling predominantly subcontract work rather than contracts, his clients were not paying their bills, he was not following up on accounts, was seeking employment with a competitor while in the employ of Maco, and that he was planning to work through the slow winter months and "draw" against future commissions and then leave the company without earning those commissions.

Around December 15, 1977, ERS ceased doing business. At that time the Haven School job was 90% to 95% complete. Maco had to hire and pay other subcontactors to complete the work of ERS. Those hired included Gravel-Vac ($2,619), Richard Yohe ($2,380) and Dennis Yohe ($160). If ERS and the original subcontractors in the contract had done their work and been paid the amounts there listed, Maco's profit would have been $26,146.15 instead of $10,791.70.

Although ERS had been paid its $65,619.08 in full by December 13, 1977, a sworn statement dated February 22, 1978, submitted by Maco to the school district indicated a balance of $32,189.05 still due ERS. A sworn statement dated June 1, 1978, indicated $9,101 as the balance still due.

On December 13, 1977, the final one-half payment of $32,809.54 was made by Maco to ERS. On the same day, Dennis Yohe requested plaintiff to come back to work to finish off the Haven School job. Plaintiff returned to the job site and worked until approximately January 15, 1978, on a continuing and regular basis. On December 23, 1977, he was paid $2,000 out of the $12,000 third-quarter earnings owed him. Plaintiff terminated his employment with Maco on January 15, 1978, after being informed by the school district that it was not going to pay the balance of the monies due Maco because liens had been placed against the property by certain subcontractors and that more liens were anticipated.

In January 1978 Maco learned that certain work had not been performed according to specifications at Haven School. Additionally, a slate roof which plaintiff was to have arranged to be repaired had not been done; tuckpointing and plumbing work had to be redone; Class C shingles had to be replaced with Class A shingles. The Haven School job was ultimately completed by Maco and paid for by the school district in August 1978.

The parties stipulated that Maco owed plaintiff $3,358.64 for third-quarter earned commissions. In addition, plaintiff claimed $6,700 as the balance of his 50 percent commission on the net profit which Maco should have received on the tear-off and replacement contract of $108,831.32, and $2,700 representing 26 percent of the $10,383.77 net profit on the resaturation work. Maco claimed a set-off of $6,700 for a prepaid commission in connection with the tear-off and replacement contract and an accommodation payment to him of $2,000 on December 23, 1977.

On February 25, 1980, judgment was entered in favor of plaintiff and against Maco for the following commissions earned under his employment contract: (a) the stipulated amount of earned commissions ($3,350.64); (b) the balance of 50 percent commission for the tear-off and replacement contract ($6,700); and (c) 26 percent commission for resaturation work ($2,700), for a total judgment of $12,750.64. Judgment was also entered for plaintiff on defendants' counterclaim.

The final judgment found, among other things:

"3. That Plaintiff secured a contract for and on behalf of the Defendants for certain work at the Haven School for School District No. 65. That under the contract dated July 7, 1977, the Defendant was the contractor, and that said contract having been hereinafter referred to as 'Basic Contract.' That Defendant elected to subcontract all of the work at the Haven School to Engineering Roofing Service, Inc., referred to as ERS, D&D Plumbing and Anderson Tuckpointing and that none of the work under the contract was to be done by Maco under the original Basic Contract, except for flashing work in the amount of $1,064.00 and that under a letter proposal dated August 16, 1977, Maco did perform certain additional work described therein.

4. That the Defendant corporation was owned and controlled by Richard Yohe and Dennis Yohe.

5. That ERS was owned and controlled by Richard Yohe and Dennis Yohe.

6. That the Plaintiff did not hold himself out to be an architect or an engineer. Maco did not rely on any representation by the Plaintiff as to whether he was experienced in or had training in either field.

7. That the failure of ERS to complete the work under the Haven School contract was caused by decisions made by Richard and Dennis Yohe over which the Plaintiff had no control.

8. That for the work that was subcontracted to ERS, the standard of performance under the specifications of the Haven School contract were or should have been determined by employees of ERS which was controlled by Richard Yohe and Dennis Yohe.

9. That the Plaintiff earned commissions under his employment contract with Maco as follows:

(a) The prime contract between Maco and School District 65 under which all work was 'sub-contract work,' under Section 6(c) of the employment contract, $6,700.00.

(b) Extra work to be done by Maco under the extra order set

forth in Maco's letter dated August 16, 1977, which was Plaintiff's Exhibit No. 13, under Section 6(a) of the employment contract, $2,700.00.

(c) Stipulated commissions for work other than the Haven School Contract, $3,350.64, for a total of $12,750.64."

Defendants contend that plaintiff's contract governs his right to commissions and that under section six of plaintiff's contract he was not entitled to commissions because all the conditions of that provision had not been satisfied. It is there provided:

"* * * To qualify for payment of the commission, the Salesman must sell and supervise the job; the job must be completed and paid for; and the Salesman must have been in the continuous employment of the Company during the aforementioned period.

In such case that Salesman's employment shall be terminated for any reason prior to the complete supervision and installation of a job, the Salesman shall not be entitled to and shall not receive credit for any commission on the said job."

Defendants admit that plaintiff had sold the Haven School job, but contend that he did not supervise that job and that it was not completed and paid for during his continuous employment. Plaintiff contends, and the trial court so found, that defendants' actions prevented ERS from completing the work and the school district from paying for it during plaintiff's employment.

■■ A party to a contract may not complain of the nonperformance of the other party where that performance is prevented by his own actions. (*Ehard v. Pistakee Builders, Inc.* (1969), 111 Ill. App. 2d 227, 250 N.E.2d 1; *Gamm Construction Co. v. Townsend* (1975), 32 Ill. App. 3d 848, 336 N.E.2d 592.) A party cannot take advantage of a condition precedent the performance of which he has rendered impossible. *Eggan v. Simonds* (1962), 34 Ill. App. 2d 316, 181 N.E.2d 354.

■■ As was stated in *Yale Development Co. v. Oak Park Trust & Savings Bank* (1975), 26 Ill. App. 3d 1015, 1020, 325 N.E.2d 418:

"* * * A party who deliberately prevents the fulfillment of a condition on which his liability under a contract depends cannot take advantage of his own conduct and claim that the failure of the fulfillment of the condition defeats his liability. (*Eggan v. Simonds* (1962), 34 Ill. App. 2d 316, 320; *Ehard v. Pistakee Builders, Inc.* (1969), 111 Ill. App. 2d 227, 233.) Delays and nonperformance while they amount to a failure to perform are excused where performance is prevented by the other party to the contract. *Pfaff v. Petrie* (1947), 396 Ill. 44, 56."

In upholding the right of a real estate broker to a commission, this

court stated in *Goldstein v. Rosenberg* (1947), 331 Ill. App. 374, 375, 73 N.E.2d 171:

> "Defendant's position is that the consummation of the deal was a condition precedent to his obligation to pay a commission, even though the failure to consummate the deal was due to his fault. This position is untenable. Defendant cites a number of cases, in most of which the purchaser defaulted in the performance of his contract. The better rule, consistent with honesty and fair dealing, is that the seller cannot take advantage of a condition precedent the performance of which he has rendered impossible. *Stern v. Gepo Realty Corp.*, 289 N.Y. 274; 12 Am. Jur., Contracts, §329; Restatement of the Law, Contracts, §295; Williston on Contracts, Rev. Ed., vol. 3, §677."

The same reasoning is applicable here. The evidence here shows: Maco and ERS, which had the same accounting department, were owned and controlled by Richard and Dennis Yohe, who leased office and warehouse space to ERS and made personal loans to it. Plaintiff was forced to use ERS for the hot roofing job at the Haven School. Indeed, the name of ERS was preprinted on the standard contract used by Maco. The president of ERS determined the $65,619.08 price for the Haven School job.

■■ On October 28, 1977, Maco paid ERS the first half of the latter's contract price. In December it became apparent to Richard Yohe that ERS was going out of business, one of the main reasons being that its owners did not pay enough attention and were not involved enough in its affairs. He also knew that ERS had not completed its work at the Haven School. Nevertheless, Maco paid ERS in full on December 13, 1977. This was to provide ERS with working capital. Despite the fact that the Yohes also knew that the completion of ERS's part of the Haven School project would require the employment of substitute workers and material-men, no money was withheld by Maco from ERS to cover those additional expenses. If that had been done, Maco's profit would have been $26,146.15, upon which plaintiff would have received a 50% commission under his contract. By paying ERS in full and having to hire others to complete the work, Maco reduced its profit and thus reduced plaintiff's commission. Plaintiff objected to the prepayment to ERS.

The reasons claimed by Dennis Yohe for terminating plaintiff's employment on December 9, 1977, were forgotten and ignored on December 13, 1977. As stated, on that date Maco paid the final one-half payment to ERS. On the same date, Dennis Yohe requested plaintiff to return to work at the Haven School. Plaintiff worked there on a continuing and regular basis until approximately January 15, 1978, when

he terminated his employment because nobody from Maco came to the job site and liens were placed against the property by unpaid subcontractors. These liens caused the school district to withhold payments.

In October the school district approved plaintiff's proposal for Maco for a maintenance program involving resaturation work. The job folder for this showed the date of order as October 10, 1977. The salesman's initials of "B.B." were crossed out and "D.Y." substituted. A purchase order did not issue until April 25, 1978, because, according to Dennis Yohe, the school district was dissatisfied with Maco's performance. The work was completed July 11, 1978, and paid for August 18, 1978. This delay was caused by the nonperformance by Maco and ERS, over which plaintiff had no control.

The prepayment of ERS in full at the time when Maco knew that ERS was going out of business and the failure to withhold monies to pay for the additional expenses in completing the contract prevented plaintiff from receiving his full commission on the ERS subcontract work. Moreover, it was Maco's lack of performance with reference to the resaturation job which defeated plaintiff's right to a commission for that work.

The trial judge correctly concluded that the failure of ERS to complete its work under the Haven School contract was caused by decisions made by Richard and Dennis Yohe over which plaintiff had no control.

As stated in *George F. Mueller & Sons, Inc. v. Northern Illinois Gas Co.* (1975), 32 Ill. App. 3d 249, 253, 336 N.E.2d 185:

> "Whether a contract has been performed according to its terms is a question of fact (*Ralph v. Karr Manufacturing Co.*, 20 Ill. App. 3d 450, 314 N.E.2d 219), and this court will not disturb the trier of fact's determination unless the finding is against the manifest weight of the evidence or the verdict is unsupported by any evidence whatsoever. *Dorweiler v. Gleim*, 8 Ill. App. 3d 190, 289 N.E.2d 471."

The trial court here determined the credibility of the witnesses and weighed the evidence. We cannot say that his finding for plaintiff was against the manifest weight of the evidence.

The trial court correctly entered judgment for plaintiff for the stipulated amount of earned commissions ($3350.64), for the balance of fifty percent commission for the tear-off and replacement contract ($6700), and for 26 percent commission for resaturation work ($2700)—a total of $12,750.64.

Maco claims a credit for the $2,000 paid Barrows on December 23, 1977. This claim was properly denied. Barrows' uncontradicted testimony was that this $2,000 was out of the $12,000 third-quarter earnings owed

him. Further, the $2,000 payment was considered in arriving at the $3,350.64 stipulated balance of earned commissions due plaintiff.

The judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

GOLDBERG, P. J., and McGLOON, J., concur.