AMERICAN FIDELITY FIRE INSURANCE COMPANY, Plaintiff-Appellee, v. GENERAL RAILWAY SIGNAL COMPANY, Defendant-Appellant.

First District (5th Division)   No. 1—87—0782

Opinion filed June 9, 1989.

Martin M. Ruken, Guy V. Croteau, and Michael P. Greenwald, all of Vedder, Price, Kaufman & Kammholz, of Chicago (Hess, Kaplan & McDowell, Ltd., of counsel), for appellant.

William I. Goldberg and Lori A. Goldstein, both of Holeb & Coff, of Chicago, for appellee.

JUSTICE PINCHAM delivered the opinion of the court:

Defendant, General Railway Signal Company (Railway Signal) appeals from a $803,500 judgment, plus pre- and post-judgment interest, in favor of plaintiff, American Fidelity Fire Insurance Company (AFFI). Plaintiff has cross-appealed from the trial court's post-trial order reducing the amount of the judgment to $683,500, with pre- and post-judgment interest. For the following reasons, we affirm.

On March 27, 1979, Transit Systems Technology, Inc. (Transit Tech.), entered into a contract with Jamaica Buses, Inc. (Jamaica Bus), a private transit system in Long Island, New York. Transit Tech. was to install 160 electronically registering bus fareboxes and certain ancillary equipment for Jamaica Bus for the sum of $360,000. Jamaica Bus required a performance bond from Transit Tech., and on June 7, 1979, Transit Tech. and its principal owners, Jimmy H. Gomez and Jose E. Davila, executed a general agreement of indemnity in favor of plaintiff, AFFI, as a condition to AFFI acting as surety on the performance bond. Also, on the same day, June 7, 1979, the United States Small Business Administration (SBA) issued a surety bond guaranty agreement, in which SBA agreed to reimburse AFFI up to 80% of its loss, if any, on the bond in favor of Jamaica Bus.

On July 3, 1979, Transit Tech. delivered to Jamaica Bus its performance bond in the amount of $360,000 and Jamaica Bus made a payment of $36,000 to Transit Tech., thereby leaving a contract balance of $324,000.

On October 15, 1979, Transit Tech. entered into two contracts with and to provide the Orange County, California, Transit District 180 electronically registering bus fareboxes and other specified equipment, for the sum of $463,500, plus tax. Like Jamaica Bus, Orange County Transit District also required performance bonds from Transit Tech. and AFFI became the surety on these performance bonds. However, AFFI required letters of credit in the amount of $120,000 as a condition to writing these performance bonds.

On November 9, 1979, the SBA issued two surety bond guarantee agreements, by the terms of which SBA agreed to reimburse AFFI up to 80% and 90% of its loss, if any, on Transit Tech.'s performance bonds to Orange County Transit District. Accordingly, on November 16, 1979, Transit Tech. issued to Orange County Transit District, Transit Tech.'s performance bonds in the amount of $463,500 and on November 19, 1979, Orange County Transit District made a payment

of $122,827.50 to Transit Tech., thereby leaving a contract balance of approximately $368,482.50.

In 1979, the defendant, Railway Signal, a subsidiary of a publicly held company whose principal business was the manufacture and sale of control and signalling systems for railroads and the rail transit industry, began investigating ways to enter the bus farebox manufacturing and installation business. The business development manager of defendant Railway Signal, Wheeler D. Maynard, learned from another farebox manufacturing company that Transit Tech. had new technology and had contracts with Orange County Transit District and Jamaica Bus to install electronically registering fareboxes on their buses.

In the summer of 1980, Transit Tech. encountered financial difficulties which prevented it from producing its electronic fareboxes. Also in the summer of 1980, Maynard spoke with an Orange County Transit District official and learned the amount of the Orange County Transit District's contract orders with Transit Tech. and that Transit Tech. had not delivered the 180 electronically registering bus fareboxes to Orange County Transit District. Thereafter, on August 22, 1980, Maynard went to Kankakee, Illinois, where Transit Tech. was located. There Maynard met with Transit Tech. principals Gomez and Davila and Transit Tech.'s attorney, Lester Thacker. Maynard informed Transit Tech. that defendant Railway Signal was planning to enter the bus farebox manufacturing and installation business and that Railway Signal might be interested in Transit Tech.'s technology and contracts. At that time, Maynard received and reviewed the first pages of the Orange County Transit District and the Jamaica Bus contracts with Transit Tech.

On September 27, 1980, Transit Tech. failed to deliver the bus fareboxes to Orange County Transit District and was placed in default on its contracts with Orange County Transit District.

Thereafter, on November 5, 1980, after negotiating with Transit Tech. principals Gomez, Davila and attorney Thacker, for the purchase of certain of Transit Tech.'s assets, defendant Railway Signal and Transit Tech. entered into four contracts: (1) an agreement of purchase between Railway Signal and Transit Tech., whereby Railway Signal acquired from Transit Tech. a patent to the "fare collection system" and various enumerated personal property, including documents, computer programs, drawings, four prototype fareboxes, a truck and miscellaneous materials; (2) a noncompetition agreement between Railway Signal, Transit Tech., Gomez and Davila; (3) a consulting agreement between Railway Signal and Gomez; and (4) a consult-

ing agreement between Railway Signal and Davila.

On November 12, 1980, Railway Signal business development manager Maynard and Railway Signal's attorney David Kunkel met with American Fidelity Fire Insurance Company attorneys, Richard Wisner and Robert Heyne, to discuss Railway Signal performance on Transit Tech.'s contracts. A "three party relet" agreement was discussed, in which Orange County Transit District, Railway Signal and AFFI would be contracting parties.

In February of 1981, Transit Tech. was placed in default of its Jamaica Bus contract for failure to deliver fareboxes to Jamaica Bus. Subsequently, in late February 1981, Jamaica Bus filed suit against AFFI under the performance bond.

On March 2, 1981, Railway Signal sent to Jamaica Bus a new contract which increased the contract price to $474,000 from the previously agreed $324,000. Also, on March 27, 1981, Railway Signal sent AFFI and Orange County Transit District Railway Signal's new third-party agreement for Orange County Transit District which increased the contract price to $417,500 from the previous contract balance of $368,000.

In June of 1981, plaintiff AFFI drew on Orange County's letter of credit and on July 14 and July 17, 1981, paid to Orange County Transit District $463,500, the amount of the contract between Orange County Transit District and Transit Tech.

Subsequently, AFFI filed a four-count complaint against Railway Signal. Count I of the complaint sought damages for Railway Signal's alleged breach of its November 5, 1980, contracts. In count I AFFI alleged that Railway Signal agreed to perform Transit Tech.'s obligations under the Orange County Transit District and Jamaica Bus contracts and that AFFI succeeded to the rights of Transit Tech., Gomez and Davila by reason of the general agreement of indemnity. In count II, AFFI claimed damages as a third-party beneficiary of the November 5, 1980, contracts. In counts III and IV, AFFI pleaded promissory estoppel and breach of an oral contract.

Defendant Railway Signal answered the complaint, alleging (1) that Railway Signal's promise to Gomez and Davila contained in the consulting agreement concerning Orange County Transit District and Jamaica Bus contracts was not a promise to perform the contracts, (2) that Gomez and Davila failed to perform conditions precedent to Railway Signal's obligation to take over Transit Tech.'s performance of the Orange County Transit District and Jamaica Bus contracts, (3) that Transit Tech., Gomez and Davila waived any performance due from Railway Signal with respect to the Orange County Transit Dis-

trict and Jamaica Bus contracts because conditions precedent to Railway Signal's performance did not occur, and that as an indemnitee, AFFI was owed no performance by Railway Signal, (4) that AFFI failed to perform the condition precedent and that AFFI caused the nonperformance of which it complained, (5) that AFFI waived any right it had to performance of the Orange County Transit District and Jamaica Bus contracts, and (6) that neither Orange County Transit District nor Jamaica Bus ever approved of the assignment of their contracts to Railway Signal for performance as required by the Orange County Transit District and Jamaica Bus contracts, and accordingly, Railway Signal had no right or duty to perform these contracts.

During the jury trial, defendant Railway Signal's motions for a directed verdict at the close of plaintiff AFFI's case, and again at the conclusion of all the evidence, were denied. The jury returned a verdict on count I against the defendant Railway Signal in the amount of $803,500. On October 10, 1986, the trial court entered judgment in favor of plaintiff AFFI and against defendant Railway Signal in the amount of $803,500, plus $168,793 prejudgment interest.

On December 9, 1986, Railway Signal filed post-trial motions for (1) arrest of judgment, (2) judgment notwithstanding the verdict, (3) a new trial, (4) a new trial as to damages only, and (5) for a remittitur. The trial court granted defendant Railway Signal's motion for a remittitur in the sum of $120,000, the amount plaintiff AFFI received on the letters of credit and prejudgment interest, and denied Railway Signal's other post-trial motions.

On appeal, defendant Railway Signal maintains that because the conditions precedent to its performance of the Orange County Transit District and Jamaica Bus contracts did not occur, the trial court should have directed a verdict or entered a judgment notwithstanding the verdict on count I of AFFI's complaint.

Count I of AFFI's complaint alleged that Railway Signal "agreed to complete the performance of [Transit Tech.] under the Jamaica and Orange County contract for the balance of the contract prices" and that "[u]nder the terms of the General Agreement of Indemnity" AFFI succeeded to the rights of Transit Tech., Gomez and Davila.

Railway Signal argues that for it to be liable to perform the Orange County Transit District and Jamaica Bus contracts for the balance of the contract prices "the contracts had to be assigned or new contracts executed directly with the bonding company [AFFI] or the Transit property." We disagree. Railway Signal cannot now avoid its contractual obligations when it prevented the assignment of the Orange County Transit District and Jamaica Bus contracts.

■ This court in *Dayan v. McDonald's Corp.* (1984), 125 Ill. App. 3d 972, 466 N.E.2d 958, examined and reviewed the duty of a contracting party to use reasonable efforts to bring about the occurrence of a condition precedent. In *Dayan* the court stated:

"In Illinois, *** a covenant of good faith and fair dealing is implied in every contract absent express disavowal. [Citation.] ***

This principle is demonstrated in a series of Illinois cases examining the duty of a contracting party to use reasonable efforts to bring about a condition precedent. [Citation.] *** [T]he contractual obligation of one party was contingent upon a condition peculiarly within the power of that party ***. Thus the controlling party could have avoided incurring any contractual obligation by refusing to bring about the relevant condition. In each case, the court held that the controlling party's discretion was limited by the implied covenant of good faith and therefore the party was obligated to use reasonable efforts to bring about the condition. ***

As the above authorities demonstrate, the doctrine of good faith performance imposes a limitation on the exercise of discretion vested in one of the parties to a contract. [Citation.] In describing the nature of that limitation the courts of this State have held that a party vested with contractual discretion must exercise that discretion reasonably and with proper motive, and may not do so arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties. [Citation.]" 125 Ill. App. 3d at 990-91.

■ In the case at bar, it was Railway Signal which prevented the Orange County Transit District and Jamaica Bus contracts from being assigned or new contracts from being executed for the balances of the contract prices. Therefore Railway Signal has, by its own actions, prevented the performance of a condition and may not now complain that the nonperformance of the assignment of the Jamaica Bus and Orange County Transit District contracts precluded Railway Signal's liability. *Barrows v. Maco, Inc.* (1981), 94 Ill. App. 3d 959, 419 N.E.2d 634.

The consulting agreements[1] provided that the consultants, Davila

---

[1]Davila and Gomez executed separate but identical consulting agreements on November 5, 1980. For brevity, the only reference hereafter will be to the "consulting agreement."

and Gomez, Transit Tech.'s principals, were to "serve as a nonexclusive agent[s] for Railway Signal in the solicitation of sales to be made by Railway Signals of certain Revenue Collection Systems." Paragraph 3 of the consulting agreement acknowledged Railway Signal's desire to enter into contracts for the sale of the systems which were previously awarded to Transit Tech. Paragraph 3 specifically provided:

"*[General Railway Signal] is \* \* \* desirous of entering into contracts for sales of Revenue Collection Systems which were previously awarded or sought by Transit* [Tech.] \* \* \*, and which have since been terminated by the buyer(s), or not awarded to Transtec [Transit Tech.]. Particular contracts and estimated amounts of Revenue Collection Systems to be sold thereunder are set forth in Appendix B (the 'Contract')." (Emphasis added.)

Appendix B provided:

"CONTRACTS TO BE DELIVERED:

1. Fare Collection System Contract with Jamaica Bus, Inc. of Jamaica, New York. \* \* \*

2. Fare Collection System Contract with Orange County Transit District of Orange County, California. \* \* \*
\* \* \*

*General Railway Signal Company* \* \* \* *agrees to enter into contracts to perform the foregoing contracts either by assignment or directly with the Transit Property or with the bonding company [AFFI] upon the same terms, conditions and specifications as contained in the said contracts with each respective Transit Property,* or upon such terms, conditions and specifications as may mutually be agreeable to GRS and the respective Transit Property subject to the following conditions:

(a) GRS [Railway Signal] is given at least (6) months within which to complete the said contracts commencing with January 1, 1981.

(b) GRS [Railway Signal] shall not be liable for any damages or penalties which may be due the Transit Property by reason of untimely performance or delay in performance; all of said damages in the nature of penalties shall remain the sole and exclusive obligation of Transit Systems Technology, Inc., an Illinois Corporation. GRS [Railway Signal] acknowledges receipt of copies of said contracts and is aware of the terms and conditions therein. *GRS [Railway Signal] further agrees that notwithstanding the amount of the contract stated therein that GRS [Railway Signal] shall perform Orange County, Califor-*

*nia and Jamaica, New York the contracts for the amounts due thereon provided the foregoing conditions have been complied with.*" (Emphasis added.)

Paragraph 5(c) of the consulting agreement provided that the consulting agreement was to terminate on "Dec. 31, 1980, in the event none of the contracts in Appendix B" were signed by that date. Railway Signal's manager of business development, Maynard, testified that he understood the contracts referred to in paragraph 5(c) of the consulting agreement were contracts to be executed between Railway Signal and the transit districts, Jamaica Bus and Orange County Transit District. Railway Signal's attorney in the transaction, Kunkel, advised Maynard that the November 5, 1980, contracts and specifically appendix B of the consulting agreement imposed upon Railway Signal a good-faith duty to negotiate with Jamaica Bus and Orange County Transit District for the assumption and performance of the Jamaica Bus and Orange County Transit District contracts for the balance of the contract prices. Kunkel testified:

"My understanding of that paragraph [in Appendix B of the consulting agreement] which I had at that time and which is not substantially changed is that *that paragraph* as it runs over on to the next page *created in GRS [Railway Signal] a good faith obligation to negotiate for the assumption of those contracts, if possible, if it entered into those contracts, then to perform them, if possible,* and to pay these consultants the commission that would then be accrued on them in terms of the rest of the agreement." (Emphasis added.)

Railway Signal was in communication with both Jamaica Bus and Orange County Transit District. The two transit districts were aware that Railway Signal had agreed to enter into agreements with the transit districts for the performance of the Jamaica Bus and Orange County Transit District contracts. Prior to the contract closing, Maynard met and talked several times with the general manager of Orange County Transit District, Jim Reichert, regarding Railway Signal's performance of the Orange County Transit District contract. Also, during November 1980, Jamaica Bus requested that Railway Signal provide a letter expressing Railway Signal's willingness to perform the Jamaica Bus contract.

On November 11, 1980, Railway Signal business development manager Maynard wrote a letter to Harold Hershenhart, the owner and general manager of Jamaica Bus. The letter stated:

"On Wednesday of last week, General Railway Signal Company completed the purchase of the Transtec Fare Collection

System design and patent rights. GRS [Railway Signal] intends to commence the manufacture of the Transtec Fare Collection System in the Chicago, Illinois area through a new Business Division of General Railway Signal Company.

I understand that Jamaica Buses, Inc. has an outstanding and uncompleted order for Fare Collection Systems that they placed with Transit Systems Tech, Inc. *GRS [Railway Signal] would like to work out arrangements with you to either transfer that order to General Railway Signal Company or to enter a new order for the same equipment purchased from GRS [Railway Signal]. I would propose that GRS [Railway Signal] enter into that order for the remaining unpaid portion of the purchase price, which I understand would be approximately $252,000. GRS [Railway Signal] would expect to supply substantially the same product as you were expecting from Transit Systems Tech, Inc. on substantially similar terms for deliveries commencing July 1, 1980.* The reason I say substantially is because we have not yet had time to review the contract documentation in detail, and not because I have any significant reservations about the present terms.

\* \* \*

GRS [Railway Signal] would expect to supply, with any firm quotation and contract proposal, a performance bond for the full value of your order. I would be pleased to meet with you at your earliest convenience to get better acquainted and to work out the details for a specific contract." (Emphasis added.)

On November 12, 1980, Maynard and Railway Signal attorney Kunkel met with AFFI's attorneys, Wisner and Heyne, to discuss Railway Signal's performance of Transit Tech.'s contracts. AFFI's attorneys advised Railway Signal that an extended delivery schedule would not be a problem for either of the transit districts and that Railway Signal would not be liable for any liquidated damages because, if such a claim were made, AFFI would assume responsibility for it. Also at the meeting the participants decided that since Orange County Transit District had declared a default, the method for documenting Railway Signal's assumption of the Orange County Transit District contract would be a "three-party relet" agreement with AFFI, Railway Signal and Orange County Transit District. At the end of the meeting, it was decided that AFFI's attorney, Heyne, would draft the relet agreement and that Kunkel would send to Heyne standard clauses regarding risk of loss and time of the essence for insertion into the relet agreement.

After the meeting, Heyne drafted the relet agreement, without the clauses to be furnished by Railway Signal's attorney, Kunkel. Several days later, Heyne phoned Kunkel inquiring about the clauses he still had not received. Kunkel informed Heyne that he had been busy and would get to it in the next several days.

On December 1, 1980, Maynard wrote Hershenhart, the owner and general manager of Jamaica Bus, a letter in which Maynard stated:

"We have reviewed the Terms and Conditions portion of that [Jamaica] contract, and *I have concluded that we will be able to substantially meet the intent and purpose of that contract.* However, I do not believe that we can escape from language revisions to make it more consistent with normal commercial practice. I appreciate this will force both of us into a new legal revision before concluding the contract, but in the long run I believe we will all be better off where our respective rights and responsibilities are unambiguously defined."

On December 4, 1980, without receiving the clauses in regards to the Orange County District Court contracts from Kunkel, Heyne sent the drafted relet agreement for the Orange County Transit District contract to Michael Bassin, litigation claims counsel of AFFI. Also during this period Bassin spoke with Orange County Transit District's attorney, Kennard Smart, and with Heyne about the relet agreement.

On January 15, 1981, Heyne sent a letter to Kunkel, requesting that Kunkel forward the clauses for insertion into the Orange County Transit District relet agreement. The letter specifically stated:

"Both the District and American Fidelity Fire Insurance Company are anxious to complete their contract. Your immediate attention to this matter is anticipated and appreciated."

On that same day, January 15, 1981, Kunkel sent a draft of a two-party agreement. The draft referred to General Farebox, Inc., Railway Signal's subsidiary, as the seller of the farebox system but did not identify a purchaser, the surety, the equipment, price or delivery dates.

On February 11, 1981, Heyne incorporated Kunkel's clauses into the Orange County relet agreement and sent another draft to Kunkel.

On March 2, 1981, James Pacelli, the vice-president and general manager of Railway Signal's newly formed farebox manufacturing subsidiary, forwarded a contract proposal to Jamaica Bus. The letter stated: "With respect to the pricing, Railway Signal would propose to furnish 160 fareboxes at a unit price of $2,025 and the off-bus ancillary equipment, as described in the specifications, at a price of

$150,000. *This relates to a total price of $474,000 exclusive of shipping charges and any applicable taxes.*" That price represented an increase of $150,000 over the $324,000, which was the remaining balance of the Jamaica Bus contract price.

On March 27, 1981, Kunkel sent a new three-party agreement for Orange County Transit District which increased the contract price to $417,500 from the previously agreed balance of $368,000. When AFFI's attorney, Wisner, received the new proposed agreement from Kunkel containing the increased price, he phoned Kunkel. Kunkel explained that the price increase was necessary because Maynard had not known that $122,827.50 had already been paid by Orange County Transit District on the contract. However, appendix B of Gomez and Davila's consulting agreement specifically stated that $122,827.50 had been paid. Furthermore, Maynard acknowledged that he knew that the $122,827.50 had been paid.

The record clearly establishes that Railway Signal did not make offers to the transit districts at any time to perform the Orange County and Jamaica Bus contracts on the terms, conditions and specifications contained in those contracts. Railway Signal failed to submit any terms or written offers to Jamaica Bus until March 2, 1981. Then, its offer was in the form of a new contract with an increased price of $474,000, $150,000 over the contract balance remaining. As to Orange County, Railway Signal's first proposal did not come until March 27, 1981. Then, it was in the form of a new agreement with an increased price of $417,150, approximately $50,000 over the remaining contract balance.

■ The evidence established that Railway Signal defaulted on the November 5, 1980, contract by breaching its good-faith duty to perform its obligations thereunder; Railway Signal cannot now complain that it did not obtain the assignments which it prevented. The trial court's denial of Railway Signal's motions for a directed verdict and for judgment notwithstanding the verdict was proper and the judgment in favor of AFFI on count I is affirmed.

Secondly, Railway Signal argues that the trial court erred in not granting its post-trial motion for a new trial on damages. Railway Signal maintains that it is entitled to a new trial on damages because AFFI failed to mitigate its damages. AFFI, however, argues that upon Railway Signal's breach of contract, AFFI was not required to accept Railway Signal's offer to perform the original contract on new or modified terms and that Railway Signal cannot limit its damages to only those which would have resulted if that offer had been accepted.

■ Where, as in the instant case, the trial court has denied a mo-

tion for a new trial, the reviewing court will not disturb the jury's verdict unless the verdict was against the manifest weight of the evidence. (*Snedden v. Lavenka* (1981), 92 Ill. App. 3d 979, 416 N.E.2d 1097.) In the instant case, Railway Signal has failed to meet the manifest weight of the evidence standard that it must satisfy to upset the jury's verdict where the trial court has denied a motion for a new trial.

Railway Signal's mitigation argument is that the contract balances were not utilized by AFFI. However, Railway Signal introduced very little evidence concerning the application of the contract balances, and the evidence that was presented does not establish that the jury's verdict was against the manifest weight of the evidence.

Wisner testified that the surety was entitled to apply the contract balances; that he was certain that the contract balances had been taken into account in making the payments; and that, hypothetically, if Orange County Transit District could have obtained the electronic fareboxes which Transit Tech. had promised to deliver for the funds left in the contract, there would have been no damages. But, Orange County Transit District did not obtain the electronic fareboxes at all. As Maynard testified, the fareboxes which Railway Signal sold Orange County Transit District in late 1981 were mechanically registering fareboxes manufactured by Keene Corporation (which had been acquired by Railway Signal). This was the technology which Maynard had considered "obsolete."

With respect to Jamaica Bus, there were "substantial differences" between the farebox system which Railway Signal sold to Jamaica Bus for $700,000 in 1983 and the system which Transit Tech. had agreed to sell to Jamaica Bus. Also Railway Signal's argument that "assuming that Orange County used the funds left from the Transtec [Transit Tech.] procurement for its subsequent purchase from General Farebox, there would appear to have been damages to Orange County only to the extent that its total outlay for 180 fareboxes (the payment of $122,827.50 to Transtec, for which it received nothing, and the payment to General Farebox of $463,500, for which it got fareboxes) of $586,327.50 exceeded the amount which it was to pay in the first place for the 180 fareboxes, $491,310. That amount is $95,019.50." That Orange County Transit District received its fareboxes for $95,017.50 is based on a false premise. Railway Signal ignores the fact that Orange County Transit District did not receive the electronic fareboxes for which it had bargained from Transit Tech.

Consequently, there is no evidentiary basis for Railway Signal's argument that the amounts paid by the transit districts to Railway

Signal for fareboxes show that AFFI breached whatever duty it may have had to apply the contract balances in satisfying the bond claims.

Notwithstanding the lack of evidence, Railway Signal's counsel argued to the jury that AFFI had not applied the contract balances. The jury did not accept the argument. The trial court upheld the jury's determination, and we affirm the trial court's ruling.

Railway Signal's second mitigation argument is that if its offer to perform the contracts at increased prices had been accepted, the damages would have been lower. Upon Railway Signal's breach of contract, AFFI was not required to accept Railway Signal's offer to perform the original contract on new or modified terms and Railway Signal cannot now limit AFFI's damages to only those which would have resulted if its offer had been accepted.

In *Coppola v. Marden, Orth & Hastings Co.* (1917), 282 Ill. 281, 118 N.E. 499, Coppola gave a written order to defendant for 40 barrels of a certain brand of olive oil at $1.30 per gallon. The oil was to be delivered within one year, terms 60-day draft with shipment. Subsequently, plaintiff called upon the defendant to deliver five of the barrels of olive oil. Defendant by letter acknowledged receipt of the order for delivery of 5 of the 40 barrels of olive oil, but stated that the European situation had affected the olive oil market, and that the oil quoted plaintiff at $1.30 was then worth $2.50 per gallon. In the letter defendant stated "[h]owever, your order was taken for forty barrels, and, subject to immediate acceptance, we shall deliver this quantity net spot cash. It is the request of our credit department that we allow no credit on oil sold at this low price." Plaintiff called upon defendant to deliver, as per the terms of their contract, the 40 barrels of olive oil. Defendant refused to deliver plaintiff the oil on credit but offered plaintiff the same oil but only for the cash price of $1.30. Plaintiff refused and purchased the oil from other firms at higher prices. Plaintiff then brought suit against the defendant for the difference between the contract price and the price plaintiff paid for the oil and obtained a judgment for $1,537.50. On appeal, the appellate court reversed the judgment and entered judgment against the defendant for $21.67, the amount of interest at the legal rate upon the price of the oil for a period of 60 days and the length of the credit extended by the contract. Plaintiff thereafter maintained before the supreme court that he was entitled to the difference between the contract price and the market price of the oil, which was $1,537.50. The supreme court held that where the contract provided for plaintiff's credit purchase of the olive oil, the defendant seller could not legally demand that the purchaser make payment in cash in order to mitigate

the purchaser's damages for the seller's breach of contract. The court stated:

> "[Plaintiff] was under no obligation to pay cash for the oil in order to lessen the damages resulting from defendant's failure to keep its promise and perform its contract. *** [*I*]*t comes with an ill-grace from a party who has refused to perform the agreement to demand that the other party, who has not been at fault, should do something contrary to the terms of the contract to mitigate or lessen the damages resulting from the refusal to perform the contract.*" (Emphasis added.) 282 Ill. at 284-85.

Also in *Olsen v. Scholl* (1976), 38 Ill. App. 3d 340, 347 N.E.2d 195, the appellate court, citing *Coppola*, held that the plaintiff was not obligated to make payment prior to or upon delivery when such payment was not required under the contract.

■ In the case at bar, Railway Signal never offered to perform the contracts for the balances remaining. Railway Signal only offered to provide other equipment on different terms for an additional $200,000. We conclude, as the *Coppola* court concluded, that "it comes with an ill-grace" for Railway Signal now to say that AFFI's damages should be limited by the terms of Railway Signal's offers, which constituted a breach of its obligations.

■ Railway Signal's final argument is that Railway Signal is entitled to a new trial because its exhibit 5 was excluded. The standard for reviewing a trial court's evidence rulings as stated in *Laff v. Chapman Performance Products, Inc.* (1978), 63 Ill. App. 3d 297, 313, 379 N.E.2d 773, is that: "A trial court's decision regarding the admissibility of evidence should be reversed only when the court's discretion has been clearly abused. [Citation.] A trial court properly rejects evidence when such evidence in the trial court is of little probative value or incompetent to prove a matter in issue."

Railway Signal's exhibit 5 was a letter dated May 29, 1981, from Smart, the attorney for Orange County Transit District, to David Pines, AFFI's attorney. The letter was written several months after Railway Signal breached its obligation and offered to supply fareboxes to Orange County Transit District only for an increased price. The letter was offered by Railway Signal to show the amount of liquidated damages paid by AFFI. The trial court properly excluded the letter on the ground that it was not material or probative.

Additionally, Railway Signal's attempt to introduce the letter was inconsistent with a proposition previously taken by Railway Signal. Before Railway Signal offered the letter, AFFI had sought to introduce the evidence deposition testimony of Orange County Transit Dis-

trict's attorney Smart to show that Orange County would not have enforced the liquidated damages clauses in the contract if it had received the fareboxes it had ordered. Railway Signal objected to the testimony on the ground that it was speculative. When counsel for both parties agreed that there had been no actual negotiations on the subject of liquidated damages, the trial court ruled that the proposed testimony was speculative. There ensued a colloquy between counsel and the trial court in which it was agreed that (1) Railway Signal would not use Attorney Smart's testimony except for impeachment, and (2) there was no admissible evidence as to what Orange County Transit District would have done regarding liquidated damages if Railway Signal had performed.

Railway Signal first attempted to introduce attorney Smart's letter, defendant Railway Signal's exhibit 5, by showing it to attorney Bassin who had ceased representing AFFI in February 1981. Attorney Bassin could not identify the letter. Then Railway Signal attempted to introduce the letter through the deposition testimony of attorney Smart. The trial court excluded the letter on the grounds of lack of materiality, because the letter did not evidence either that any claim for liquidated damages had been made, or how much, if any, of the money ultimately paid by AFFI was liquidated damages. Railway Signal's exhibit 5, Orange County Transit District attorney Smart's letter written after Railway Signal's breach, was speculative and not probative. As the trial court ruled, the letter did not contain evidence as to whether, and if so, in what amount, liquidated damages were claimed by Orange County Transit District or paid by AFFI.

■ Moreover, even if the amount paid to Orange County Transit District to satisfy the bond claim included liquidated damages, that amount was paid as a result of Railway Signal's breach. If Railway Signal had performed, it would not have been responsible for liquidated damages. But Railway Signal's breach of the November 5, 1980, contract prevented Railway Signal from taking advantage of one of its terms. In *Goldstein v. Lustig* (1987), 154 Ill. App. 3d 595, 507 N.E.2d 164, the plaintiff's breach of his employment contract by using corporate books and records to further an insurance fraud scheme prevented plaintiff from enforcing the term of the contract entitling him to resignation benefits. The court held that "[a] party who materially breaches a contract cannot take advantage of the terms of the contract which benefit him." 154 Ill. App. 3d at 599.

■ In the case at bar, Railway Signal cannot claim a benefit from a term of its November 5, 1980, contract which provided that Railway Signal would not be liable for liquidated damages if it performed,

where Railway Signal did not perform. Moreover, any evidence relating to liquidated damages was speculative and we need not speculate whether Orange County Transit District would have claimed or been paid liquidated damages if Railway Signal had delivered the fareboxes in accordance with the terms and conditions of appendix B of the Gomez and Davila consulting agreement.

Finally, notwithstanding the lack of evidence, Railway Signal's counsel argued that liquidated damages accrued at more than $7,500 per week and that AFFI had improperly paid liquidated damages to Orange County Transit District. Since the jury did not accept that argument, the exclusion of defendant's exhibit 5, attorney Smart's letter, which is simply a calculation of liquidated damages accrued through the date of the letter, was not an abuse of the trial court's discretion.

■ Lastly, on cross-appeal, AFFI maintains that the trial court erred in ordering a remittitur of the amounts AFFI collected under the letter of credit. First AFFI asserts that "it will be obligated to reimburse those who posted the Letters of Credit" if it ultimately recovers the remitted amount. AFFI's relationship with the makers of the letters of credit requires no obligation to repay any amount recovered. The only obligation set forth in the letters of credit is, in the event the letters of credit are drawn down, such funds should be returned to the credit makers of the letters of credit. If no funds remain, there is no obligation to return anything to the makers. Therefore we conclude that AFFI is mistaken when it states, "it will be obligated to reimburse those who posted the Letters of Credit."

■ Secondly, AFFI argues that such funds constitute a "collateral source." In Illinois, the collateral source rule applies in contract cases only where there is an element of fraud, tort, or wilfulness. In *GNP Commodities, Inc. v. Walsh Heffernan Co.* (1981), 95 Ill. App. 3d 966, 420 N.E.2d 659, the plaintiff, a speculator in frozen pork bellies, bought pork bellies from the defendant based upon defendant's representation that the pork bellies had been frozen after February 1. The pork bellies had in fact been frozen before November 1 of the previous year and therefore were not deliverable according to Exchange rules. The plaintiff resold the pork bellies and sued the defendant for the difference in value between the pork bellies as sold by the plaintiff and their market value as represented. The plaintiff's complaint alleged a breach of contract, fraud, misrepresentation, and wilful fraud. Following a jury trial, the jury awarded plaintiff the damages sought. The court held that even if plaintiff made a profit on futures contracts for pork bellies, the court saw "no reason why the collateral

source rule should not apply to bar defendants from reducing damages by proof that plaintiff had been compensated from a source to which they have not contributed."

We conclude that AFFI was not legally entitled to invoke the collateral source rule and that the trial court properly remitted the judgment by the amount drawn by AFFI on the letters of credit.

For the foregoing reasons the judgment of the trial court is affirmed.

Affirmed.

MURRAY, P.J., and COCCIA, J., concur.