**WEIDNER COMMUNICATIONS, INC., A Utah corporation, Plaintiff–Appellant,**

v.

**H.R.H. PRINCE BANDAR AL FAISAL, H.H. Princess Basma Bint Majid Bin Abdul Aziz, H.R.H. Prince Saud Abdullah Al Faisal, Ali Fissa Belkairous, the Saudi Group, an entity formed under the laws of Saudi Arabia, and Saudi Computer Aided Translation, Ltd., an entity formed under the laws of Saudi Arabia, Defendants–Appellees.**

No. 87–2645.

United States Court of Appeals, Seventh Circuit.

Argued April 7, 1988.

Decided Oct. 21, 1988.

Rehearing Denied Dec. 30, 1988.

Harry P. Lamberson, Chapman & Cutler, Chicago, Ill., for plaintiff-appellant.

William E. Kelly, Pope Ballard Shepard & Fowe, Chicago, Ill., for defendants-appellees.

Before BAUER, Chief Judge, and COFFEY and MANION, Circuit Judges.

COFFEY, Circuit Judge.

The plaintiff-appellant Weidner Communications, Inc., a Utah corporation with its principal place of business in Northbrook, Illinois (hereinafter WCC),[1] filed a complaint alleging breach of contract, RICO violations, common law fraud, restitution, tortious interference with contractual relations, breach of fiduciary duty, and conversion. The named defendants include three members of the royal family of Saudi Arabia (Prince Bandar, his wife, Princess Basma and Prince Saud); an Algerian national, Ali Fissa Belkairous; The Saudi Group, a venture capital entity; and Saudi Computer Aided Translation, Ltd., a company formed in Saudi Arabia as a joint venture of the Saudi Group and WCC to market computerized English to Arabic translation services in the Middle East. The district court dismissed the case, finding that § 5 of the "Clarification Agreement" conferred exclusive jurisdiction on Saudi Arabian courts.

[1] In January, 1987, Weidner Communications, Inc., merged with and became Worldwide Communications Corporation, an Illinois corporation with its principal place of business in Northbrook, Illinois.

Plaintiff appeals the district court's decision, we reverse and remand.

## I.

On about February 22, 1985, the Saudi Group and WCC entered into a Joint Venture Agreement that largely embodied the terms of a prior letter of intent between the parties. The Joint Venture Agreement stated that WCC would develop and provide a computer system to the Saudi Group to translate English into Arabic and provided for the formation of a company known as Saudi Computer Aided Translation, Ltd. (hereinafter SCAT). WCC was to receive monetary payment in two installments and was to become a 43 percent owner of SCAT, eventually sharing in the profits of what was expected to be a very profitable English to Arabic computer aided translation enterprise. The first installment of $100,000 was paid to WCC upon execution of the Joint Venture Agreement. The remaining installment of $2,400,000 was to be paid upon the delivery and installation of the system and SCAT's certificate of acceptable operation of the same.

In reliance on the Joint Venture Agreement, WCC incurred significant expenses and obviously devoted substantial effort developing the computer system and installing it in Saudi Arabia for SCAT. The district court determined that "WCC had complied with the terms of the Joint Venture ..." Agreement by September 5, 1985. The complaint alleges that about a week after WCC had completed its obligations under the Joint Venture Agreement (on about September 12, 1985):

"Defendant Prince Bandar invited Garrett [president of WCC] to his palatial home for a meeting, ostensibly to show his gratitude to Garrett and WCC for the successful development, delivery and installation of the Product [the computer translation system]. Previous to this meeting, Prince Bandar had requested his employees to take Garrett to the town square in Riyadh, Saudi Arabia, where punishment was publicly inflicted upon criminals. At the meeting, Prince Bandar, acting on his own behalf and on behalf of the Saudi Defendants, initially discussed with Garrett [the recent] beheading of three persons ... and then threatened and intimidated Garrett, at which point Prince Bandar initiated a negotiation with Garrett in which he insisted that WCC agree to accept a drastic reduction in the monies and compensation to which it was entitled under the agreement.[2]"

WCC asserts that the purpose of this action was to intimidate and force Garrett (as president of WCC) into accepting less consideration than called for in the Joint Venture Agreement. The complaint also alleges:

"Garrett, perceiving the obvious threat posed to his own personal safety and well-being and realizing that it would be useless to further demand the immediate payment of the compensation to which WCC was entitled or the return of the Product (and the source code and components) left Prince Bandar's palatial home and immediately took a plane back to the United States. Garrett has refused to return to Saudi Arabia because of the present and real danger for his personal safety and well-being."

The district court stated "[k]nowing that WCC incurred substantial expenses for the services it performed to date, [the] defend-

**2.** *Garrett's affidavit generally supports the allegations contained in the complaint stating:*

"Previous to this meeting ... I had been taken by a servant of Prince Bandar to the town square in Riyadh where punishment was publicly inflicted upon criminals. Numerous ·statements were made to me by Prince Bandar's servant about the power possessed by Prince Bandar and the other Saudi princes to imprison or otherwise punish people, including foreigners, at their whim,.... A meeting was then held at which Prince Bandar at-

tempted to renegotiate the compensation to which WCC was entitled under the Joint Venture Agreement and went into an apparent rage at my refusal to do so. I considered Prince Bandar's actions, taken together with the references made to punishment or imprisonment, to pose a threat to my personal safety and well being and, therefore, left Prince Bandar's home, returned to the United States and have not since returned to Saudi Arabia."
Prince Bandar's amended affidavit does not address this specific allegation.

ants offered to pay the remainder due under the joint venture agreement if WCC would perform additional services not required under the Joint Venture Agreement...." 671 F.Supp. 531, 534. This offer resulted in the execution of a written "Clarification Agreement" on October 15, 1985, and it recites that $100,000 was paid to WCC on October 30, 1984, and an additional $700,000 was being paid to WCC upon the execution of the Clarification Agreement. The Clarification Agreement required WCC to perform certain services and provide additional equipment, including word processing equipment and the interfacing of that equipment with the system, not set forth in the Joint Venture Agreement and provided that the balance of defendants' payments to WCC would be secured by an irrevocable letter of credit. The defendants' payment under the Clarification Agreement was to be made in two installments. The first installment was to be paid to WCC upon their certification to the European American Bank (the holder of the letter of credit) that it had completed the work required by the Clarification Agreement. The second installment was to be paid to WCC upon SCAT's certification of the satisfactory operation of the computer system. The Clarification Agreement (§ 3) states that SCAT's final certification was to be tendered "[u]pon submission by Tom Cassell or the then acting President of the Company [SCAT] to the issuing bank of a statement certifying that delivery and installation to the Company of the interface ... is operating satisfactorily." Tom Cassell was employed by WCC in 1984 to assist in the planning and operation of SCAT and was the general manager of SCAT until he resigned in May 1986. WCC trained Cassell in the operation of the computer system.

On February 4, 1986, Prince Saud wrote Garrett (WCC president) that SCAT received a $430,000 capital contribution from the defendants on WCC's behalf, for WCC's 43 percent equity share in that corporation. No stock certificates were conveyed to WCC and WCC alleges no stock certificates were ever issued. After the representation that the capital contribution had been made, WCC installed the equipment according to the specifications of the agreement and although certain problems were experienced with the interface (through no fault of WCC), the system was up and fully operative as of the first week of March 1986. Cassell's affidavit affirms that the system and the interface "fulfilled everything they were supposed to do under the Joint Venture Agreement and the October, 1985 Agreement, and both performed satisfactorily." Moreover, a memorandum from Garrett to Cassell dated March 10, 1986 (attached to Garrett's affidavit and made a part thereof), states that it was Garrett's understanding that the system was working "very well" and, further,

> "as per the Agreement dated October 15, 1985 and the Letter of Credit dated November 4, 1985, please write me a confirmation letter ... Either you, as Acting President or HRH Prince Saud, as President, should sign the letter...."

Prince Saud, in reply to further communication from WCC referred WCC to his New York representative and, finally, on April 16, 1986, Prince Saud telexed a message that SCAT would not sign the confirmation until Ali Fissa Belkairous, an Algerian national trained by WCC to use the system and employed by SCAT, returned to Saudi Arabia and confirmed the satisfactory operation of the interface called for in the Clarification Agreement.

SCAT, for reasons unknown, never delivered the certification of the computer system's satisfactory performance to the bank. Thereafter, WCC petitioned the district court alleging breach of contract, RICO violations, common law fraud, restitution, tortious interference with contractual relations, breach of fiduciary duty, and conversion. SCAT filed a motion to dismiss and argued that because the equipment had not been certified, the final payment was not yet due, thus, the district court lacked jurisdiction under operation of the Clarification Agreement's forum selection clause (§ 5).[3] Section 5 entitled "jurisdiction," states in its entirety:

---

3. The defendants did not directly assert the un-    derlying substantive defenses on the merits of

"The parties further covenant and agree that *from and after the time that all payments due under this agreement have been paid to WCC in full, in any action or proceeding brought by SG or WCC* or any party claiming through them, directly or indirectly, and whether or not brought under the Joint Venture Agreement, as well as the agreement of February 22, 1985, or the promissory note or in this agreement or any other agreements relating to the acquisition and installation of the English to Arabic source code, *the parties shall and do hereby waive trial by jury and agree that the courts of Saudi Arabia shall have exclusive jurisdiction of any such action or proceeding and that Saudi Arabian law will apply* in such action or proceedings."

(Emphasis added.) The defendants' motion to dismiss asserted that the district court lacked personal jurisdiction of the defendants because neither the defendants nor their agents are citizens or residents of Illinois, they have never been in Illinois, and therefore they have not submitted to the jurisdiction of Illinois. The motion to dismiss also asserted that process was not properly served on the defendants. The district court dismissed the complaint, determining that § 5 of the Clarification Agreement conferred "exclusive jurisdiction" on the Saudi Arabian courts.

WCC argues on appeal that the district court erred in determining that the forum selection clause contained in the Clarification Agreement conferred exclusive jurisdiction on the Saudi Arabian courts. WCC

also requests that we determine whether (1) the district court has personal jurisdiction; (2) the defendants have been properly served and accorded due process; and (3) venue is proper in the Northern District of Illinois.

## II.

### A. *Procedural Background*

The forum selection clause has been raised and argued by the defendants as part of their motion to dismiss under Fed. R.Civ.P. 12(b).[4] The original Motion for Dismissal stated in relevant part:

"Defendants [names of defendants omitted] ..., by their attorneys, move the Court pursuant to 12(b) of the Federal Rules of Civil Procedure, 'Fed.R.Civ.P.', (28 U.S.C.) to dismiss this action as to them for lack of jurisdiction over their persons, for insufficiency of service of process and for the failure of some or all of the counts to state a claim on which relief can be granted in whole or in part."

Because of the condition of the record we are unable to ascertain with certainty whether the district court relied upon Rule 12(b)(1) (subject matter jurisdiction); Rule 12(b)(2) (personal jurisdiction); Rule 12(b)(3) (venue); Rule 12(b)(4) or (5) (process); or Rule 12(b)(6) (failure to state a claim) in deciding this issue. We believe the district court must have proceeded under Rule 12(b)(2) (personal jurisdiction). For example it determined two separate grounds for subject matter jurisdiction stating: "[j]urisdiction is based on undis-

the case in the motion to dismiss on jurisdictional grounds. However, one of the recitals in the Clarification Agreement states:

"WHEREAS, SG contends that WCC has not complied with its obligations under the Joint Venture Agreement, however, in an effort to show good faith SG is willing to make the payment of $700,000 referred to above to induce WCC to comply with its remaining obligations under the Joint Venture Agreement."
The district court stated:
"On a motion to dismiss there is no dispute about the facts alleged in the complaint although it can be fairly inferred that should the case be tried the defendants will argue that the plaintiff has been paid over $1,300,-

000 for a translation system that does not work as promised."

4. Rule 12(b), Fed.R.Civ.P., states:
"Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim or third-party claim shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: (1) lack of jurisdiction over subject matter, (2) lack of jurisdiction over the person, (3) improper venue, (4) insufficiency of the process, (5) insufficiency of service of process, (6) failure to state a claim upon which relief can be granted, (7) failure to join a party under Rule 19."

puted diversity jurisdiction ... [j]urisdiction also is founded on a claim for relief under the Federal RICO law." We agree the district court has had subject matter jurisdiction and are convinced the motion was not granted under Rule 12(b)(1) (subject matter jurisdiction).[5] We also wish to point out that the district court expressly declined to rule on at least two of the questions raised under Rules 12(b)(2) and 12(b)(5) in the following language:

"One ground, the lack of jurisdiction under the longarm statute and under the due process clause may well require the taking of evidence (Fed.R.Civ.P. 12(b)(2) and (56)) [sic].... The questions of whether process was properly served may also require the taking of evidence."

Moreover, although the Clarification Agreement (including the forum selection clause) was attached to the motion, the motion itself does not raise the operation of the forum selection clause under Fed.R.Civ. P. 12(b)(3).[6] We, nonetheless, deem the forum selection clause is before us as the parties argued the operation of the clause both in the district court and on appeal and the district court granted the motion to dismiss on that basis. The district court allowed the parties to file affidavits relating to the motion to dismiss [7] but decided the motion based on the clause and both parties fully briefed and argued the clause's operation on appeal.

The district court judge focused on the forum selection clause stating: "This clause *does confer exclusive jurisdiction* and plaintiff offers four reasons to preclude its application." (emphasis added).[8]

---

**5.** The district court properly states: "They [the defendants] claim the absence of personal jurisdiction, failure of proper service and failure to state a claim upon which relief can be granted." A scant paragraph later, the court states:

"Defendants argue that the case belongs in Saudi court pursuant to the terms of the Clarification Agreement. A forum selection clause is to be enforced unless it is shown to be unreasonable and its enforcement is especially favored in cases of international commerce. [Citations omitted]."

**6.** Our determination that the district court proceeded under Rule 12(b)(2) (jurisdiction over the person) is further supported because: (1) the court's statement that the clause confers "exclusive jurisdiction"; (2) venue is not raised in the motion for dismissal under Rule 12(b)(3) (see Rule 12(g)); and, (3) both briefing and discovery were limited to sufficiency of process and personal jurisdiction by an Agreed Order. Moreover, "[t]he omission from the Federal Rules of Civil Procedure of a provision for converting a Rule 12(b) motion into a summary judgment motion if evidence is submitted with it was not an oversight." *Crawford v. United States,* 796 F.2d 924, 928 (7th Cir.1986) (a case under Rule 12(b) stressing the need for procedural care and diligence). Therefore, the defendants' motion cannot be converted to a motion for summary judgment.

**7.** In *Nelson by Carson v. Park Industries, Inc.,* 717 F.2d 1120, 1123 (7th Cir.1983) we stated that it was proper for a court to receive and weigh affidavits to determine whether it has personal jurisdiction. We also stated:

"During this preliminary proceeding, although the burden of proof rests on the party asserting jurisdiction if the district court's decision is based on the submission of written materi-

als the burden of proof is met by a prima facie showing that ` personal jurisdiction is conferred under the relevant jurisdictional statute ... [citations omitted]. Further, the party asserting jurisdiction is entitled to the resolution in its favor of all disputes concerning relevant facts presented in the record." *Id.* A *complaint* should not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Mathers Fund, Inc. v. Colwell Co.,* 564 F.2d 780, 783 (7th Cir.1977).

**8.** It seems likely that the parties and the district court confused personal jurisdiction with the doctrine of *forum non conveniens.* The distinction, however, is clearly juxtaposed in *Bremen v. Zapata,* 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972) (an international admiralty case). In that case the defendant raised two grounds for dismissal by the United States federal courts: (1) lack of jurisdiction; and (2) *forum non conveniens* based on a contractual forum selection clause. In upholding the forum selection clause, the Supreme Court stated:

"No one seriously contends in this case that the forum selection clause 'ousted' the District Court of jurisdiction over ... the action. The threshold question is whether that court should have *exercised* its jurisdiction to do more than give effect to legitimate expectations of the parties, manifested in their freely negotiated agreement, by *specifically enforcing the forum clause.*"

*Id.,* 407 U.S. at 12, 92 S.Ct. at 1914 (emphasis added).

There is also a distinction between *forum non conveniens* and venue: "the doctrine of *forum non conveniens* can never apply if there is absence of jurisdiction or mistake of venue." *Gulf*

He then proceeded to analyze each of the four reasons for clause preclusion asserted by WCC.

The first reason WCC offered the district court in support of preclusion of the clause's application was the plain meaning of the clause's language. The other reasons: the defendants waived the operation of the forum selection clause by filing suit against WCC in the Federal District Court of New York; that Saudi Arabian courts would not provide a neutral forum; and, that such clauses do not govern tort claims. We need only reach the first of these reasons.

### B. *Application of the Forum Selection Clause*

The district court, in determining that the forum selection clause conferred "exclusive jurisdiction" on the Saudi Arabian courts, reasoned as follows:

"The clause may take effect before every dollar called for in the clarification agreement is paid, so long as every dollar *then due* has been paid. Whether the dollar *is due under* the clarification agreement is resolvable on the face of the pleadings and the undisputed exhibits. The second payment to WCC *is due* 'upon submission by Tom Cassell or the then acting President of [SCAT] to the issuing bank of a statement certifying that delivery and installation ... of the interface ... has been completed and is operating satisfactorily.' (October 15, 1985 Clarifying Agreement, section 3). No such submission is alleged to have occurred. *In Tom Cassell's affidavit,* filed by plaintiffs as an exhibit to its response to the dismissal motion, *there is no claim that he ever submitted the statement which is a precondition of payment,* though he remained as SCAT's general manager until May, 1986."

(Emphasis added, brackets in original).

As an initial matter we question the district court's conclusion that the forum selection clause did not require all contractual payments to be made before it became

*Oil Corporation v. Gilbert,* 330 U.S. 501, 504, 67 S.Ct. 839, 841, 91 L.Ed. 1055 (1947); Wright,

operative. The district court's construction of this clause creates a rather strange result. At times when no payment was due the Saudi courts would be the exclusive forum. But at later times, when additional payments became due, the clause would not operate until the payments were made. At those times a suit could be brought in any court. A more reasonable interpretation of the clause would be that all payments called for under the contract are required to be made before the exclusive forum provision could operate.

Although we have difficulties with this aspect of the district court's construction of the forum selection clause, we need not rest our decision on this basis. Even under the above interpretation of the forum selection clause, this provision does not create an exclusive forum in Saudi Arabian courts under the facts of this case. In order for the forum selection clause to operate, according to the district court, it is necessary that all of SCAT's payments *then* due be paid. Thus, if any payment due at a particular time has not been paid, the forum selection clause does not operate. The district court concluded that no payment was currently due because Cassell's certification of performance was a prerequisite for a payment to be due to WCC and this certification did not take place. We disagree.

In approaching the question of whether a payment to WCC was due, which would render the forum selection clause inoperative, we begin by addressing the question of the appropriate law to be applied. "[N]either party, in this court or the district court, has discussed choice of law ... '[w]hen the parties fail to consider a choice of law in a diversity case, the substantive law of the forum is presumed to control.'" *Rush Presbyterian St. Luke's Med. Center v. Safeco Ins. Co.,* 825 F.2d 1204, 1206 (7th Cir.1987) *quoting Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n,* 805 F.2d 663, 681 n. 33 (7th Cir.1986), *cert.*

Cooper, & Miller, 15 *Federal Prac. & Proc.* § 3828 p. 287 (1986).

*denied*, 480 U.S. 941, 107 S.Ct 1593, 94 L.Ed.2d 782 (1987).[9]

Turning to the requirements of Illinois substantive law, we note that: "In Illinois, as in the majority of American jurisdictions, a covenant of good faith and fair dealing is implied in every contract absent express disavowal." *Dayan v. McDonald's Corp.*, 125 Ill.App.3d 972, 81 Ill. Dec. 156, 169, 466 N.E.2d 958, 971 (1984). Therefore, it is well settled law in Illinois that where a contractual obligation (like payment of an installment) is contingent upon a condition peculiarly within the power of the obligor (certification) the controlling party is required to exercise good faith and use reasonable effort to "bring about the condition." *Id.*, 81 Ill.Dec. at 170, 466 N.E.2d at 972 *citing Osten v. Shah*, 104 Ill.App.3d 784, 60 Ill.Dec. 497, 433 N.E.2d 294 (1982); *Central National Bank in Chicago v. Fleetwood Realty Corp.*, 110 Ill.App.3d 169, 65 Ill.Dec. 730, 441 N.E.2d 1244 (1982); *Pierce v. MacNeal Memorial Hospital Assoc.*, 46 Ill.App.3d 42, 4 Ill.Dec. 615, 360 N.E.2d 551 (1977); *Dasenbrock v. Interstate Restaurant Corp.*, 7 Ill.App.3d 295, 287 N.E.2d 151 (1972).

Furthermore, a party who deliberately prevents or interferes with the fulfillment of a contractual condition through his own conduct (e.g. failure to certify) cannot take advantage of that conduct and claim that the failure of the condition defeats his liability under the contract. *Horwitz v. Alloy Auto Co.*, 656 F.Supp. 1039, 1044 (N.D.Ill. 1987) *citing Yale Development Co., Inc. v. Oak Park Trust & Savings Bank*, 26 Ill. App.3d 1015, 325 N.E.2d 418 (1975); *Barrows v. Maco, Inc.*, 94 Ill.App.3d 959, 966, 50 Ill.Dec. 526, 531, 419 N.E.2d 634, 639 (1981). For example, in *Barrows v. Maco, Inc.*, an Illinois appellate court held that Barrows was entitled to a sales commission on a roofing job even though the contract terms governing the payment of the com-

mission had not been fulfilled. In determining that Barrows was entitled to the commission the court stated "it was Maco's lack of performance with reference to the resaturation [roofing] job which defeated plaintiff's [Barrows'] right to a commission for that work." 50 Ill.Dec. at 532, 419 N.E.2d at 640.

When we move to the application of the Illinois substantive law to the facts of this case, it is clear from the pleadings and affidavits that the computer translation system was operating satisfactorily. The affidavits also establish that SCAT refused to certify the system's operation but did not specify reasons for its refusal. The pleadings and affidavits further allege facts that establish that SCAT's refusal was in bad faith. Specifically, Cassell's and Garrett's affidavits taken together clearly demonstrate that SCAT wrongfully withheld the certification of satisfactory performance denying payment to WCC for work already performed. Further, the pleadings and affidavits establish that Cassell's action can be imputed to SCAT and the remaining defendants. The district court's opinion relied on the absence of Cassell's certification, but for some unexplained reason failed to explicitly discuss the question of whether those actions could be imputed to SCAT and the other defendants. The April 16, 1986, telex from Prince Saud in response to WCC's request for certification states in unambiguous language that SCAT would not sign the confirmation "until and unless" Ali Fissa Belkairous, an Algerian national employed by SCAT and trained by WCC, confirmed its satisfactory operation. The telex expressly states "... I regret to say that T. Cassell and Jandora will not sign any confirmation letter until and unless Ali confirms the working of Wang interface." Cassell was "acting President" of SCAT and was identified in the Clarification Agreement as the person to certify the satisfactory perform-

---

**9.** The defendants mention the issue of which nation's substantive law applies (choice of law) in a short passage in brief but offer no support for concluding that Saudi Arabian law applies. Their primary contention is that the district court's interpretation of the clause is correct. The district court apparently applied Illinois

law. We note that Rule 44.1, Fed.R.Civ.P., requires "[a] party who intends to raise an issue concerning the law of a foreign country shall give notice by pleadings or other reasonable written notice," and the record fails to disclose that this was done.

ance of the computer system. Neverthe-less, Prince Saud held the title of President and the defendants were controlling share-holders of SCAT; thus, the defendants themselves held the corporate power and authority to direct the actions of SCAT's employees including Cassell. Therefore, Cassell's refusal to certify performance must be imputed to SCAT and the other defendants. The meaning of SCAT's telex from Prince Saud removes any doubt con-cerning this conclusion: "Cassell ... will not sign any confirmation letter ..." even though Cassell's affidavit affirmed that "WCC's Product and the Wang interface fulfilled everything they were supposed to do under the Joint Venture Agreement and the October, 1985 Agreement, and both performed satisfactorily."

Because Illinois law precludes parties from avoiding an obligation on the basis of their bad faith refusal to perform a condi-tion wholly within its power, a payment is now due to WCC. Although payment is due, neither SCAT nor the other defend-ants has made such payment. Thus, the forum selection clause cannot operate in this case because, by its very terms, a "payment due under this agreement" has not "been paid to WCC in full."

The general proposition in *Bremen v. Zapata*, 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed. 2d 513 (1972), that "[a] forum selection clause is to be enforced unless it is shown to be unreasonable and its enforcement is specially favored in cases of international commerce" does not require a different conclusion. In *Bremen*, the Supreme Court emphasized that the choice of forum clause was the result of "an armslength negotiation by experienced and sophis-ticated businessmen," 407 U.S. at 12, 92 S.Ct. at 1914, and that the agreement con-taining the clause was "freely negotiated," 407 U.S. at 12 n. 14, 17, 92 S.Ct. at 1914 n. 14, 1917. The Court stated that forum selection clauses unaffected by "undue in-fluence, or overweening bargaining power" are enforceable. *Bremen*, 407 U.S. at 12, 92 S.Ct. at 1914.[10]

The presence in *Bremen* of a "freely negotiated" agreement between parties of relatively equal bargaining power contrasts with the "undue influence" and "overween-ing bargaining power" presented here. Only after WCC had substantially per-formed its obligations under the Joint Ven-ture Agreement, including the expenditure of substantial financial resources and ef-fort in Saudi Arabia, did the defendants offer to "renegotiate." WCC had trained employees for SCAT, developed the com-puter system and installed it in Saudi Ara-bia and had not received the full measure of the consideration contemplated in the Joint Venture Agreement. The Clarifica-tion Agreement recited that the Joint Ven-ture Agreement called for total compensa-tion to WCC of $2,500,000 and that only $100,000 had been paid by the defendants. Thus, there was a clear inequality of bar-gaining power between the defendants and WCC at the point of renegotiation. In the present case the defendants had everything to gain and nothing to lose by renegotiat-ing the Joint Venture Agreement because, through their possession of the operating computer system in Saudi Arabia, they had already received the benefit of their bar-gain to WCC's detriment.

Moreover, renegotiation of the Joint Ven-ture Agreement was first suggested by the defendants in a meeting in Saudi Arabia after an alleged attempt to physically in-timidate WCC's president (Garrett). Gar-rett's affidavit stated he feared for his personal safety as a result of his expres-sion of his unwillingness to change the terms of the Joint Venture Agreement and that he had left Saudi Arabia for this rea-son. This intimidation together with the unequal bargaining power combine for a transactional environment clearly demon-strating "undue influence, or overweening bargaining power" of the type that may affect the enforceability of the clause un-der *Bremen*. At the very least it cannot be fairly said that the Clarification Agreement was "freely negotiated" between parties possessing equal bargaining power as was

---

**10.** *Cf. Stewart Organization, Inc. v. Ricoh Corp.,* — U.S. ——, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988) (discussing generally the application of *Bremen v. Zapata* in diversity cases).

the case in *Bremen*. Therefore the district court's reliance on, and emphasis of, *Bremen* is inappropriate because the factual underpinnings of the two cases are clearly distinguishable.

## III.

The pleadings and affidavits demonstrate that the defendants are attempting to take advantage of their bad faith refusal to certify the computer system's satisfactory operation. This bad faith refusal precludes the application of the particular forum selection clause found in this case. Moreover, we are convinced that *Bremen* does not require a different result, because of the absence of a "freely negotiated" agreement between parties of relatively equal bargaining power. Thus we hold that the forum selection clause embodied in § 5 of the Clarification Agreement does not contractually "require" the parties to adjudicate this matter in Saudi Arabian courts and, in any event, does not prohibit the United States Courts from exercising jurisdiction. We need not decide the other issues presented for review and we decline to do so.[11] Accordingly, we reverse the district court's ruling on the forum selection clause, and remand to the district court for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

---

**11.** We call to the attention of the district court, without direction, that in *Augustine v. United States*, 704 F.2d 1074 (9th Cir.1983) (involving subject matter jurisdiction), the Ninth Circuit Court of Appeals stated that where jurisdictional issues and substantive issues are so intertwined that the issue of jurisdiction is dependent on resolution of factual issues going to the merits, the determination of jurisdiction should await the determination of relevant facts on either a motion on the merits or at trial.