877 F.2d 574
 RUSH-PRESBYTERIAN-ST. LUKE'S MEDICAL CENTER, the Chicago
Regional Organ and Tissue Bank, Dr. Frederick K.
Merkel, June D. Bajor and South Chicago
Community Hospital, Plaintiffs-Appellees,
v.
The HELLENIC REPUBLIC, a Foreign Country, the Hellenic
Republic National Agricultural Insurance Institute, a Greek
Institution, and the Social Insurance Institute of Greece, a
Greek Institution, Defendants-Appellants.
 No. 88-2663.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 14, 1989.
Decided June 14, 1989.
 
 George C. Pontikes, Foss, Schuman, Drake & Barnard, Theodore Rodes, Jr., Porikos, Rodes & Economos, Arlington Hills, Ill., for defendants-appellants.
 Before CUDAHY, POSNER and RIPPLE, Circuit Judges.
 CUDAHY, Circuit Judge.
 
 
 1
 The principal issue in this appeal is whether the Greek government's execution of a contract to reimburse physicians and an organ bank for the costs of kidney transplants performed on Greek nationals constitutes a "commercial activity" under the Foreign Sovereign Immunities Act of 1976 ("FSIA" or "the Act").[1] The district court held that the Greek government's execution of the contract constituted a "commercial activity," and therefore the defendants were not immune from suit under the exceptions to sovereign immunity contained in the Act. Rush-Presbyterian-St. Luke's Medical Center v. The Hellenic Republic, 690 F.Supp. 682 (N.D.Ill.1988). The defendants appeal; we affirm.
 
 I.
 
 2
 Under the Greek constitution, the government has a broad obligation to provide health care services to Greek citizens. Apparently, kidney transplants are not widely performed in Greece; in order to fulfill its constitutional mission to provide medical services to Greek nationals, the Greek government entered into a contract with Dr. Frederick Merkel, June Bajor and the Chicago Regional Organ and Tissue Bank in December, 1983. The agreement was negotiated in Greece, but executed in the United States. The contract provided that the Greek government would send its citizens to Chicago for transplant operations at local hospitals. The estimated cost for the transplant operations was $35,000; however, the contract stated that "these costs are not secure" and that additional charges might arise due to unforeseen complications in a patient's treatment. Bills for medical costs were to be submitted to the Greek consulate in Chicago; the contract also provided that the Greek government would maintain an account at a local bank in order to pay for the services rendered.
 
 
 3
 Several kidney transplants governed by the contract were performed at Rush-Presbyterian-St. Luke's Medical Center and South Chicago Community Hospital. After performing the medical services in question, Rush and South Chicago submitted to the organ bank bills ostensibly based on their costs. The organ bank in turn submitted the bills for payment to the Greek government. Apparently, the bills submitted by Rush and South Chicago were substantially higher than the Greek government had anticipated, or were not properly documented; as a result, only partial payment was made, leaving an outstanding, unpaid balance of $346,915.81 owing to Rush-Presbyterian and approximately $203,219.48 to South Chicago.
 
 
 4
 Rush filed the present suit on March 24, 1986, seeking to recover the balance owed for the kidney transplants under theories of breach of contract and quantum meruit. Dr. Merkel, Bajor and the organ bank, the parties to the contract with Greece, were later added as involuntary parties-plaintiff. In January, 1987, South Chicago successfully moved to intervene in the case; its complaint in intervention also sought recovery based on contract and quantum meruit theories.
 
 
 5
 The district court denied the defendants' motions to quash the summons and dismiss the complaints on July 11, 1988. Rush-Presbyterian-St. Luke's Medical Center v. The Hellenic Republic, 690 F.Supp. 682 (N.D.Ill.1988). The court found that Greece's execution of the contract was a commercial activity, since "[t]he essence of the contract here was the exchange of money for kidney transplant services," an activity which private parties could perform, whatever the purposes for which Greece had entered this particular transaction. Id. at 685-86. The court also held that the transaction bore a sufficient connection to the United States to support subject matter and personal jurisdiction, since "[t]he transplants were performed, payments for them collected and documentation of these transactions presented in the United States." Id. at 686. The court additionally noted that the plaintiffs had allegedly suffered a direct financial injury in the United States due to Greece's breach of contract. Id. For these reasons, the court found that sovereign immunity did not bar the suit under the "restrictive theory of sovereign immunity" codified in the FSIA. Greece appeals.[2]
 
 II.
 
 6
 Plaintiffs concede that the defendants are either foreign states or instrumentalities of foreign states as those terms are employed in the FSIA. 28 U.S.C. Sec. 1603(a), (b). Therefore, in order for the defendants to be amenable to suit in a United States court, their conduct must fall within one of the exceptions to sovereign immunity contained in the Act. Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 493-94, 103 S.Ct. 1962, 1971-72, 76 L.Ed.2d 81 (1983).
 
 
 7
 In what remains one of the leading decisions interpreting the FSIA, Judge Irving Kaufman noted that "[i]n structure, the FSIA is a marvel of compression." Texas Trading & Milling Corp. v. Federal Republic of Nigeria, 647 F.2d 300, 306 (2d Cir.1981), cert. denied, 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982). However, as Judge Kaufman also observed, "[t]his economy of decision has come [ ] at the price of considerable confusion." Id. at 307; see also Gibbons v. Adaras na Gaeltachta, 549 F.Supp. 1094, 1105, 1106 (S.D.N.Y.1982) (characterizing FSIA as "remarkably obtuse," a "statutory labyrinth [with a] bizarre structure and [ ] many deliberately vague provisions"). Fortunately, in the eight years since the Texas Trading decision, many difficult interpretive questions have been answered; our resolution of the current appeal is accordingly a fairly straight-forward matter.
 
 The FSIA provides that
 
 8
 The district courts shall have original jurisdiction without regard to the amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title or under any applicable international agreement.
 
 
 9
 28 U.S.C. Sec. 1330(a). Thus subject matter jurisdiction over a foreign state is expressly conditioned on a finding that the defendant is not entitled to sovereign immunity. Verlinden, 461 U.S. at 493, 103 S.Ct. at 1971 ("subject matter jurisdiction in any [ ] action [against a foreign sovereign] depends on the existence of one of the specified exceptions to foreign sovereign immunity"). Insofar as relevant here, the FSIA provides that
 
 
 10
 (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case--
 
 
 11
 * * *
 
 
 12
 (2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.
 
 
 13
 28 U.S.C. Sec. 1605. The only definition of "commercial activity" contained in the Act states that
 
 
 14
 A "commercial activity" means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.
 
 
 15
 28 U.S.C. Sec. 1603(d). In order to determine whether the defendants are immune from suit, we must answer two related questions: (1) did the defendants engage in a "commercial activity" in the United States or abroad?; and (2) if so, does this activity bear a significant relation to the United States, and is plaintiffs' action "based upon" the defendants' commercial activity? It is to these questions we now turn.
 
 A.
 
 16
 As a number of other courts have recognized, the definition of "commercial activity" in the FSIA is not especially helpful, and is in fact somewhat circular. "Commercial activity" is defined by reference to "commercial conduct" and "commercial transaction[s] or act[s]." Yet nowhere in the Act's text or legislative history is the crucial term "commercial" defined. It appears from the FSIA's legislative history that the term "commercial" was deliberately left undefined; Congress placed its trust in the courts to develop, through an evolving body of case law, a workable definition of a "commercial activity."[3]
 
 
 17
 An important starting point in determining whether a particular transaction or course of conduct constitutes "commercial activity" is the Act's admonition that the court look to the conduct's nature, rather than its purpose. Certainly, "nature" and "purpose" do not demark hermetically sealed, separate domains; "[o]ften, the essence of an act is defined by its purpose." De Sanchez v. Banco Central de Nicaragua, 770 F.2d 1385, 1393 (5th Cir.1985). However, while "nature" and "purpose" may not be neatly separable concepts in all cases, this court has stressed that "the command of Congress embodied in 28 U.S.C. Sec. 1603(d) requires that we confine any consideration of purpose as closely as we can, considering that purpose only so far as is absolutely necessary to define the nature of the act in question." Segni v. Commercial Office of Spain, 835 F.2d 160, 164 (7th Cir.1987) (emphasis added); see also Joseph v. Office of Consulate Gen. of Nigeria, 830 F.2d 1018, 1023 (9th Cir.1987) (while FSIA directs courts to look to nature of activity rather than purpose, "the purpose of an act may be relevant in defining its nature") (emphasis original), cert. denied, --- U.S. ----, 108 S.Ct. 1077, 99 L.Ed.2d 236 (1988).
 
 
 18
 In determining the nature of the foreign state's action, an important inquiry is whether a private person could have engaged in similar conduct. If a private person could have engaged in the same type of activity, then the sovereign has presumptively engaged in "commercial activity" within the meaning of the FSIA; however, if no private party could have engaged in the challenged conduct, then the conduct is a sovereign act, and the foreign state is immune from suit.[4]
 
 
 19
 As the legislative history of the FSIA reveals, contracts for the purchase or sale of goods or services are presumptively "commercial activities." Segni, 835 F.2d at 163 ("[c]ontracts for the purchase of goods or services ... ought normally to be considered commercial"); Practical Concepts, 811 F.2d at 1549 ("a contract between a foreign state and a private party for the purchase of goods and services 'may presumptively be,' but is not inevitably, 'commercial activity' "). However, certain contracts, although generally of a type in which a private person could enter, are by their nature governmental, since only a sovereign entity deals in the particular kind of goods or services. For example, although a private party could allow another to exploit the animal or mineral resources on the former's land (to the extent permitted by local law), a contract whereby a foreign state grants a private party a license to exploit the state's natural resources is not a commercial activity, since natural resources, to the extent they are "affected with a public interest," are goods in which only the sovereign may deal.[5] Further, while private persons routinely enter employment agreements, employment contracts between a foreign state and its civil servants, diplomats or military personnel are not "commercial" transactions, since the employment of such personnel is intimately connected with the foreign state's formulation and execution of government policy.[6]
 
 
 20
 Other activities undertaken by a foreign state, although generally resembling conduct routinely engaged in by private parties, may also be labeled "governmental" and immune from suit under the FSIA. For example, although private entities often rehabilitate buildings to serve as office space, a foreign state's remodelling and operation of a chancery building is not a "commercial" act, since the construction and operation of a diplomatic office are peculiarly sovereign activities. MacArthur Area Citizens Ass'n v. Republic of Peru, 809 F.2d 918, 920 & n. 2 (D.C.Cir.1987).[7] And, while private entities may certainly publish libelous statements (and sometimes with frequency), another court has held that allegedly libelous statements contained in the periodical Izvestia were made in the course of a governmental activity, since Izvestia is "the voice of an official Soviet agency." Gregorian v. Izvestia, 871 F.2d 1515, 1522 (9th Cir.1989).
 
 
 21
 These cases illustrate that a court faced with a claim of immunity must be sensitive to the particular facts of the case before it. If the transaction in question involves a type of good or service in which only a sovereign could deal, then the foreign state's assertion of sovereign immunity should be upheld. However, if private parties could engage in an identical transaction, then the activity is "commercial", and sovereign immunity is not an obstacle to suit. In order to draw the fine distinction between "commercial" and "governmental" actions, the court must disregard the scope of the particular transaction at issue. Thus it is irrelevant that no private person has ever purchased a million pairs of army boots, or a million tons of cement, in a single transaction. The important question is whether private parties purchase cement or boots, which they clearly do. The court should also carefully focus on the specific conduct at issue in the case before it, rather than the broad program or policy of which the individual transaction is a part. For example, in Segni this court defined the activity underlying the suit as "a contract under which [the plaintiff] would provide services in the area of product marketing," rather than, more broadly, "the promotion of Spanish exports to bolster the Spanish economy," even though the contract for public relations services was clearly part of a larger government program to promote exports of Spanish wine. 835 F.2d at 165.[8] Moreover, the court should concentrate on the "basic exchange" embodied in the contract, rather than subsidiary provisions (tax exemptions, waiver of import duties, etc.) to which only a sovereign nation could agree. Practical Concepts, 811 F.2d at 1548-50; Tifa Ltd. v. Republic of Ghana, 692 F.Supp. 393, 401 (D.N.J.1988) ("exemption from import duties ... ancillary to the alleged promise" forming the gravamen of plaintiff's complaint).
 
 
 22
 The defendants argue that the "commercial activity" exception to sovereign immunity does not apply to their conduct, since "the provision ... of Social Security and health benefits by THE HELLENIC REPUBLIC to citizens in Greece is not a commercial activity, but a governmental one." In the defendants' estimation, "[t]he contract is but one small part of the exercise of [Greece's] sovereign and legal obligation to provide medical and health care benefits to its citizens." The defendants also note that the provision of health care services by a government to its citizens is not normally carried on for profit, and that "[n]o private party can possibly afford to insure an entire population." The Greek government also argues that no private insurer would be able to insist that an administrative proceeding serve as the exclusive avenue for resolution of claims disputes, nor would a private insurer be able to turn to general treasury funds, raised by taxes on the entire populace, in order to finance its operations.
 
 
 23
 We cannot accept Greece's arguments. Its first contention, that the contract can only be viewed as one small part of the Greek government's fulfillment of its constitutional obligation to provide for the health of its people, is not persuasive. This argument impermissibly departs from the "nature" of Greece's conduct, and instead focuses primary attention on the "purpose" for which Greece entered this particular agreement. The purpose behind the defendants' execution of the kidney transplant contract is irrelevant to the immunity question. Rather than look to the purpose of the agreement, we must ask whether private parties ever enter contracts to reimburse health care providers for medical services performed on third parties, assuming that the private party has a preexisting obligation to attend to the third parties' medical needs. It is clear that private parties in the United States enter such agreements routinely. Employers, health maintenance organizations and private insurers often enter into agreements with health care providers for the provision of medical services which the private party is obliged to provide to a third party but which the private party is not itself capable of performing. Whether the obligation to provide these services arises from the relation of government to citizen, or employer to employee, or insurer to insured is simply irrelevant--the "basic exchange" of money for health care services is the same in each context. We decline to focus exclusively, for purposes of determining immunity, on the purpose for which Greece happened to enter this particular transaction.
 
 
 24
 Greece's argument that its activity cannot be commercial because it did not enter this particular transaction for profit also misses the mark. As we explained above, supra note 4, although some courts may have suggested otherwise, we do not believe that a foreign sovereign must intend to generate a profit from the particular transaction in order for its activities to be "commercial". Greece's argument that no private insurer could afford to insure an entire nation is also meritless, since it focuses on the scope of the transaction, rather than its nature. While private parties may undertake to insure only ten, or ten thousand, individuals, and the Greek government may insure ten million, the transactions partake of an identical "nature"--namely, the agreement to reimburse a health care provider for the costs of performing medical services for a third party. Finally, we reject Greece's argument that its activity is not commercial because no private insurer could levy taxes on an entire population in order to finance its insurance operation, nor could any private party enforce an exclusive administrative remedy for claims disputes. The source of funds to finance a particular transaction is irrelevant to the transaction's essential nature. Moreover, the administrative trappings which may surround Greece's reimbursement scheme are ancillary to the "basic exchange" at issue here--an undertaking to reimburse for health care services performed.
 
 
 25
 In short, none of Greece's arguments persuade us that the kidney transplant agreement is of a peculiarly governmental nature. There is nothing about the provision of and payment for health care services which is uniquely governmental. Assuming a preexisting duty to provide health care to others, private parties often enter contracts with health care providers to reimburse the providers for the reasonable costs of performing medical services. Therefore, we hold that Greece's execution of the contract at issue in this case constituted "commercial activity" within the meaning of the FSIA. The only remaining question is whether the present suit is "based upon" commercial activity bearing a substantial relationship to the United States.
 
 B.
 
 26
 Greece argues quite vehemently that, even if it was involved in a "commercial activity," that activity did not take place in the United States. We need not resolve the question whether the defendants, either personally or through their agent, the Greek consulate, engaged in "commercial activities" in the United States. For whatever the correct answer to this question, it is clear that the defendants engaged in a commercial activity (somewhere) which "cause[d] a direct effect in the United States" under the third clause of section 1605(a)(2).
 
 
 27
 Certainly, the effects of a foreign state's conduct on persons in the United States may not be "purely fortuitous"; instead, to support jurisdiction under the FSIA the domestic effects of a foreign state's actions must be "substantial" and "direct and foreseeable." The fact that an American corporation or individual has suffered financial injury due to the foreign state's actions may not be sufficient to establish FSIA jurisdiction unless the foreign state has performed some "legally significant act" here.[9] In this case, we believe that the defendants' commercial activities did cause a direct effect in the United States. The defendants' concede that the contract was executed in the United States, and the transaction has allegedly caused financial injury to American entities. Moreover, at the defendants' request, the plaintiffs performed kidney transplant operations in Chicago. Cf. Transamerican S.S. Corp. v. Somali Democratic Republic, 767 F.2d 998, 1004 (D.C.Cir.1985) (finding a "direct effect" where, at defendant's direction, "a significant transaction was effectuated in the United States"). The contract specifically provided that claims for reimbursement were to be submitted to the Greek consulate in Chicago, and payments were to be made from an account at a local bank, which the contract specifically required the defendants to establish and maintain. See Meadows v. Dominican Republic, 817 F.2d 517, 523 (9th Cir.) (finding "direct effect" based on financial injury to American residents and fact that payments under contract to be collected in the United States), cert. denied, --- U.S. ----, 108 S.Ct. 486, 487, 98 L.Ed.2d 485 (1987). Whether or not these considerations would be independently sufficient to establish "direct effects" jurisdiction, we have no doubt that, in the aggregate, these factors abundantly support jurisdiction under the third clause of section 1605(a)(2).
 
 
 28
 The defendants also suggest, somewhat obliquely, that plaintiffs' quantum meruit claims are not "based upon" the defendants' execution of the kidney transplant contract. The defendants are correct that quantum meruit recovery may be available without reference to any underlying contractual agreement. However, while quantum meruit is a "non-contractual" basis for recovery, it is clear that the quantum meruit claims in this case are related to the execution and performance of the contract. This is sufficient under the FSIA, which merely requires that the plaintiff's claims possess an identifiable nexus to the defendant's commercial activity.[10] Further, it is immaterial that the plaintiffs were not themselves parties to the defendants' commercial activities; whether the plaintiffs have enforceable third-party claims against the defendants goes to the merits of plaintiffs' claims, rather than the preliminary question whether the allegations in the complaint are "based upon" defendants' commercial acts. Ministry of Supply, Cairo v. Universe Tankships, Inc., 708 F.2d 80, 84 (2d Cir.1983) (Friendly, J.).
 
 
 29
 At several points in its appellate brief the defendants emphasize that domestic (Greek) providers of health care services under contract with the Greek government must submit their invoices for administrative review by government agencies, and are reimbursed only for services rendered based on fee schedules contained in Greek administrative regulations. Defendants argue that it would be inequitable to allow the plaintiffs here to circumvent this complex administrative scheme for physician reimbursement by filing suit directly in an American court. The government contends that affirmance of the district court "would [ ] grant[ ] to [plaintiffs-appellees] [ ] a substantive basis for recovery which they would not have in Greece."
 
 
 30
 Our finding that Greece is not immune from suit does not prejudge any choice of law question which Greece may wish to assert on remand. Certainly, it is conceivable that the district court may be persuaded to apply Greek law, and specifically the Greek regulations governing physician reimbursement, to this transaction. More broadly, we would respond to Greece's concerns over the applicable law and appropriate forum by noting that the Greek government could have specified in its contract with Merkel, Bajor and the organ bank that Greek law would apply to any dispute arising out of the agreement, and that the parties could only resort to a Greek administrative or judicial forum in order to assert rights founded on the contract. Within broad limits, such choice of law and forum selection clauses are enforced by American courts.[11] Of course, if such choice of law or forum selection clauses had been suggested by the defendants, plaintiffs may have demurred, or sought some other concession as a quid pro quo. This is the result intended by the FSIA--the rights and remedies of contracting parties should be specified explicitly in the contract, so that the parties may intelligently evaluate the bargain in all its aspects.
 
 III.
 
 31
 Based on the foregoing, we find that the defendants engaged in a "commercial activity" and, whether or not the defendants' acts were performed here, the plaintiffs' claims are "based upon" a commercial activity having a "direct effect" in the United States. The defendants are therefore not entitled to immunity under the FSIA.
 
 The judgment of the district court is
 
 32
 AFFIRMED.
 
 
 
 [1]
 Pub.L. No. 94-583, 90 Stat. 2891, codified at 28 U.S.C. Secs. 1330, 1332(a)(2)-(a)(4), 1391(f), 1441(d), and 1602-1611
 
 
 [2]
 Since sovereign immunity is an immunity from trial and the attendant burdens of litigation, and not just a defense to liability on the merits, the denial of a claim of sovereign immunity is an immediately appealable interlocutory order under the "collateral order doctrine" of Cohen v. Benefical Industrial Loan Corp., 337 U.S. 541, 545-47, 69 S.Ct. 1221, 1225-26, 93 L.Ed. 1528 (1949). See Compania Mexicana de Aviacion, S.A. v. United States Dist. Court, 859 F.2d 1354, 1358 (9th Cir.1988) (per curiam); Segni v. Commercial Office of Spain, 816 F.2d 344, 347 (7th Cir.1987)
 
 
 [3]
 See Segni v. Commercial Office of Spain, 835 F.2d 160, 163 (7th Cir.1987) ("Congress intended to afford the federal courts 'a great deal of latitude in determining what is a "commercial activity" ' "); Practical Concepts, Inc. v. Republic of Bolivia, 811 F.2d 1543, 1549 (D.C.Cir.1987); Transamerica S.S. Corp. v. Somali Democratic Republic, 767 F.2d 998, 1002 (D.C.Cir.1985); Velidor v. L/P/G Benghazi, 653 F.2d 812, 817 n. 7 (3d Cir.1981), cert. dismissed, 455 U.S. 929, 102 S.Ct. 1297, 71 L.Ed.2d 474 (1982); Texas Trading, 647 F.2d at 308-09 (Congress "put [its] faith in the U.S. courts to work out progressively, on a case-by-case basis ... the distinction between commercial and governmental")
 
 
 [4]
 See Gould, Inc. v. Pechiney Ugine Kuhlmann, 853 F.2d 445, 452 (6th Cir.1988); Segni, 835 F.2d at 164 ("for FSIA purposes [the nature of a transaction] may be divined by asking whether a similar agreement could have been entered into with a private party"); Joseph, 830 F.2d at 1024 ("if the role of the sovereign is one which might be played by a private actor," the activity is commercial); Meadows v. Dominican Republic, 817 F.2d 517, 523 (9th Cir.), cert. denied, --- U.S. ----, 108 S.Ct. 486, 487, 98 L.Ed.2d 485 (1987); Practical Concepts, 811 F.2d at 1549; West v. Multibanco Comermex, S.A., 807 F.2d 820, 825 (9th Cir.), cert. denied, 482 U.S. 906, 107 S.Ct. 2483, 96 L.Ed.2d 375 (1987); Callejo v. Bancomer, S.A., 764 F.2d 1101, 1108 n. 6 (5th Cir.1985); Transamerican S.S. Corp. v. Somali Democratic Republic, 767 F.2d 998, 1003 (D.C.Cir.1985); Velidor v. L/P/G Benghazi, 653 F.2d 812, 817 n. 7 (3d Cir.1981), cert. dismissed, 455 U.S. 929, 102 S.Ct. 1297, 71 L.Ed.2d 474 (1982); LeDonne v. Gulf Air, Inc., 700 F.Supp. 1400, 1408-09 (E.D.Va.1988)
 In Letelier v. Republic of Chile, 748 F.2d 790, 797 (1984), cert. denied, 471 U.S. 1125, 105 S.Ct. 2656, 86 L.Ed.2d 273 (1985), the Second Circuit approved the "private person" test, but also suggested that, in order to determine whether a foreign state has engaged in a commercial activity, the court must "search[ ] for evidence of a profit motive on the foreign sovereign's part." We cannot accept this parsing of the term "commercial activity." As noted by the Ninth Circuit in Joseph, "the use of profit motive as a threshold requirement for applying the commercial activity exception would be inconsistent with the FSIA's focus on the nature of the transaction rather than its purpose." 830 F.2d at 1024. Moreover, since foreign sovereigns often enter the commercial marketplace with no intention of making a profit thereby, (for example, to purchase supplies to outfit the nation's military), Letelier 's suggestion would virtually eliminate the "commercial activity" exception to sovereign immunity.
 
 
 [5]
 See, e.g., MOL, Inc. v. People's Republic of Bangladesh, 736 F.2d 1326, 1329 (9th Cir.) (government's grant of license to capture and export rhesus monkeys for scientific experimentation not a commercial activity, since the agreement "concerned Bangladesh's right to regulate its natural resources, [ ] a uniquely sovereign function"), cert. denied, 469 U.S. 1037, 105 S.Ct. 513, 83 L.Ed.2d 403 (1984); International Ass'n of Machinists v. Organization of Petroleum Exporting Countries (OPEC), 477 F.Supp. 553, 567-69 (C.D.Cal.1979) (foreign governments' participation in cartel to regulate price and supply of crude oil not a commercial activity, since it involves regulation of the exploitation of a natural resource), aff'd on other grounds, 649 F.2d 1354 (9th Cir.1981), cert. denied, 454 U.S. 1163, 102 S.Ct. 1036, 71 L.Ed.2d 319 (1982)
 In a related vein, the Fifth Circuit has held that the sale of foreign exchange by a government-owned and operated central bank constituted a "governmental", rather than "commercial", activity. De Sanchez v. Banco Central de Nicaragua, 770 F.2d 1385, 1393-94 (5th Cir.1985). Although sales of foreign exchange, even by government-run financial institutions, are normally commercial acts, the Fifth Circuit held, on the particular facts before it, that the central bank's actions were integrally related to the bank's sovereign function of rationing Nicaragua's limited reserves of foreign currency in order to avert an economic crisis. To the extent that De Sanchez hinged on the fact that foreign exchange was a scarce commodity in post-revolutionary Nicaragua, and that the central bank's function was to safeguard this resource in the public interest, we believe that the case was correctly decided. Cf. Callejo v. Bancomer, S.A., 764 F.2d 1101, 1110 (5th Cir.1985) (sale of foreign exchange by government-owned bank a "commercial activity" where bank had no special role in formulating or implementing government's exchange-control policy). However, to give the "commercial activity" exception its proper scope, De Sanchez must be limited to the extraordinary circumstances before the court in that case.
 
 
 [6]
 The House Report on the FSIA specifically notes that "the employment of diplomatic, civil service, or military personnel" is a "public or governmental," rather than commercial, activity. H.Rep. No. 1487, 94th Cong., 2d Sess. 16, reprinted in 1976 U.S.Code Cong. & Admin.News 6604, 6615. See also Tuck v. Pan Am. Health Org., 668 F.2d 547, 550 (D.C.Cir.1981) (allegation that international organization interfered with plaintiff's provision of legal services to organization's employees involves governmental function, since plaintiff's claims "arise from the PAHO's supervision of its civil service personnel and from its provision and allocation of office space"); Broadbent v. Organization of Am. States, 628 F.2d 27, 34-36 (D.C.Cir.1980) (wrongful discharge claims by members of "the internal administrative staff" of international organization do not arise out of "commercial" transaction)
 In Segni v. Commercial Office of Spain, 835 F.2d 160 (7th Cir.1987), this court found that an employment agreement between a foreign state and a private party for the provision of public relations services constituted a "commercial activity" under the FSIA. However, our opinion was careful to note that the plaintiff "had no role in the creation of government policy or its administration; rather, he simply carried it out. There is no indication in the record that he was so supervised or monitored by the [foreign state], or so privy to its political deliberations, as to be considered a part of the Spanish government, as a civil servant or diplomat would be." Id. at 165.
 
 
 [7]
 The MacArthur Area Citizens Association case can profitably be compared with Joseph v. Office of Consulate General of Nigeria, 830 F.2d 1018 (1987), in which the Ninth Circuit held that a foreign state was not immune from suit for damages allegedly caused to a residence leased by the state for its consular personnel. In the former case, the D.C. Circuit emphasized the unique considerations involved in the construction and operation of a chancery building--security and communications needs, heavy traffic flows, etc. These considerations are foreign to the construction and operation of private, commercial office space; therefore Peru was immune from suit for its alleged creation and maintenance of a nuisance. In Joseph, however, the building occupied by Nigerian consular personnel was simply employed as a residence. Since private employers often lease residential space for their employees, and Nigeria's execution of the lease and occupancy of the residence were identical to a private-sector transaction, the transaction was characterized as "commercial"
 
 
 [8]
 As the Fifth Circuit has explained, "[t]he focus of the exception to immunity recognized in Sec. 1605(a)(2) is not on whether the defendant generally engages in a commercial enterprise or activity ...; rather, it is on whether the particular conduct giving rise to the claim in question constitutes or is in connection with commercial activity, regardless of the defendant's generally commercial or governmental character." Arango v. Guzman Travel Advisors Corp., 621 F.2d 1371, 1379 (5th Cir.1980); see also, e.g., Transamerican S.S., 767 F.2d at 1003 (describing defendant's actions as "essentially those of a collection agent," rather than those "of a foreign sovereign diplomatically attempting to maintain friendly relations" by mediating commercial dispute between American and foreign entities); LeDonne v. Gulf Air, Inc., 700 F.Supp. 1400, 1408-09 (E.D.Va.1988) ("proper application of the 'private party' test requires a sharp and accurate focus on the specific activity in question"); Baglab Ltd. v. Johnson Matthey Bankers Ltd., 665 F.Supp. 289, 294 (S.D.N.Y.1987) (noting that immunity issue could hinge on whether conduct in question is the general "nationalization of a financially troubled private bank," or "the specific repudiation of [the nationalized bank's] financing agreement with plaintiffs")
 
 
 [9]
 See, e.g., Gregorian v. Izvestia, 871 F.2d at 1527 ("to establish a 'direct effect' in the United States resulting from an act occurring abroad, a plaintiff must establish that 'something legally significant actually happened in the U.S.' ") (quoting Zedan v. Kingdom of Saudia Arabia, 849 F.2d 1511, 1514 (D.C.Cir.1988)); Gould, Inc. v. Pechiney Ugine Kuhlmann, 853 F.2d 445, 453 (6th Cir.1988); Callejo v. Bancomer, S.A., 764 F.2d 1101, 1111 (5th Cir.1985); Maritime Int'l & Nominees Establishment v. Republic of Guinea, 693 F.2d 1094, 1110-11 (D.C.Cir.1982) (financial loss to American corporation, standing alone, does not establish a "direct effect" in the United States), cert. denied, 464 U.S. 815, 104 S.Ct. 71, 78 L.Ed.2d 84 (1983); Tifa Ltd. v. Republic of Ghana, 692 F.Supp. 393, 402-04 (D.N.J.1988) (finding "direct effect" based on financial loss to United States corporation, together with fact that goods manufactured in United States)
 
 
 [10]
 Compania Mexicana de Aviacion, S.A. v. United States Dist. Court, 859 F.2d 1354, 1360 (9th Cir.1988) (per curiam); Gould, Inc. v. Pechiney Ugine Kuhlmann, 853 F.2d 445, 452 (6th Cir.1988) ("there must be a connection between [the defendant's commercial] activity and the act complained of in the lawsuit"); Barkanic v. General Admin. of Civil Aviation, 822 F.2d 11, 13 (2d Cir.) (tort claim arising out of airline crash in China "based upon" defendant's commercial act of selling plaintiff's decedent airline ticket in United States), cert. denied, --- U.S. ----, 108 S.Ct. 453, 98 L.Ed.2d 393 (1987); Callejo v. Bancomer, S.A., 764 F.2d 1101, 1109 (5th Cir.1985); Vencedora Oceanica Navigacion, S.A. v. Compagnie Nationale Algerrienne de Navigacion, 730 F.2d 195, 200-03 (5th Cir.1984) (noting differing approaches to proper construction of "based upon"; concluding that action "based upon" commercial activity where there is "a nexus between [defendant's] commercial activity in the United States and [plaintiff's] grievance"); Gilson v. Republic of Ireland, 682 F.2d 1022, 1027 n. 22 (D.C.Cir.1982); Velidor v. L/P/G Benghazi, 653 F.2d 812, 820 (3d Cir.1981), cert. dismissed, 455 U.S. 929, 102 S.Ct. 1297, 71 L.Ed.2d 474 (1982); Gemini Shipping, Inc. v. Foreign Trade Org., 647 F.2d 317, 319 (2d Cir.1981); Sugarman v. Aeromexico, Inc., 626 F.2d 270, 273 (3d Cir.1980); Hester Int'l Corp. v. Federal Republic of Nigeria, 681 F.Supp. 371, 382-84 (N.D.Miss.1988); Tote v. Iberia Int'l Airlines, 649 F.Supp. 41, 42-43 (E.D.Pa.1986) (where plaintiff's decedent, an American resident, died on domestic Spanish flight for which tickets purchased in Spain, tort claim not "based upon" airline's unrelated commercial activities in United States)
 
 
 [11]
 See, e.g., The Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 15, 92 S.Ct. 1907, 1916, 32 L.Ed.2d 513 (1972) (forum selection clause should be enforced, especially in context of international commercial agreement, unless party can "clearly show that enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching"); Weidner Communications, Inc. v. H.R.H. Prince Bandar al Faisal, 859 F.2d 1302, 1309 (7th Cir.1988) (same); Checkers, Simon & Rosner v. The Lurie Corp., 864 F.2d 1338, 1344-45 (7th Cir.1988) (Illinois law; contractual choice of law clause will be enforced so long as "reasonable")